**FEDERATION FOR AMERICAN IMMIGRATION REFORM (FAIR) et al., Plaintiffs,**

v.

**Philip M. KLUTZNICK, Secretary of Commerce et al., Defendants.**

Civ. A. No. 79–3269.

United States District Court, District of Columbia.

Feb. 26, 1980.

George J. Weiner, Washington, D.C., for plaintiffs.

Mellie H. Nelson, Atty., Dept. of Justice, Washington, D.C., for defendants.

Frederick A. O. Schwarz, Jr., admitted pro hac vice, New York City, for intervenors.

Before WALD, Circuit Judge and GASCH and PARKER, District Judges.

## OPINION

This court is convened as a three-judge court to consider the constitutionality of the 1980 census, due to be conducted within a few weeks, insofar as it will fail to establish the number of illegal aliens in the country, or the states and districts within which they live. The failure to undertake this effort, plaintiffs[1] allege, will result in the inclusion of a large but presently unascertainable number of illegal aliens in the population figures which form the basis for the apportionment of United States Representatives among the states, the apportionment by many states of their congressional and state officials among districts, and the distribution of federal funds for a variety of programs. The exclusion of illegal aliens from the apportionment population base is mandated, they contend, by the Constitution, which assertedly contemplates that only lawful residents should be included in the population figures from which apportionment is made. Since current estimates indicate that the bulk of illegal aliens live in a

---

1. The plaintiffs joined in the Amended Complaint include the Federation for American Immigration Reform [FAIR] and the Committee for Representative Government on their own behalf and as representatives of their members, Representatives from Kentucky, California, Illinois, Vermont and Pennsylvania and a Pennsylvania Senator.

relatively few states, and further within a relatively few cities within those states, undifferentiated inclusion of illegal aliens in the general population figures will result in disproportionate allocations to those states and regions of both congressional Representatives and federal funds distributed on the basis of population. Thus, the plaintiffs allege, the votes of persons in some states or regions will be diluted in comparison to those in the states and regions with a large illegal alien population, and those same persons may, as residents of the disadvantaged states or regions, also receive a lesser share of federal monies.

We conclude that we lack jurisdiction to decide the merits of the case because the plaintiffs lack standing to raise the issue, and we therefore grant summary judgment to the defendants.[2]

I. *The Census and the Constitution: The Positions of the Parties*

The 1980 decennial census, scheduled to commence April 1, 1980, will be the twentieth effort to enumerate the population of the United States, pursuant to constitutional and statutory command, for the principal purpose of determining the number of Representatives which each state is entitled to send to the United States House of Representatives. Article I, section 2, clause 3, of the Constitution provides:

Representatives . . . shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct.

With the abolition of slavery, the formula for apportionment was revised. The fourteenth amendment modified the first sentence of article I, section 2, clause 3, to provide:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.

The most recent Census Act, 13 U.S.C. §§ 1 *et seq.*, adopted in 1976, charges the Secretary of Commerce with the responsibility of conducting the census, calculating the number of Representatives to which each state is entitled, and transmitting those figures to the President, who then, pursuant to the mandate of 2 U.S.C. § 2a, delivers them to the Clerk of the House of Representatives, who officially notifies each state of the size of its delegation. The allocation of Representatives is accomplished pursuant to a formula known as the "method of equal proportions," which, it has been determined by Congress, results in an allocation of Representatives most nearly proportional to the actual population figures of the several states. *Id.*

The census figures are also used for a variety of other purposes. Most relevant to this lawsuit is the fact that many states use the figures as the basis for their own internal apportionment of state and local governmental bodies, and Congress requires the use of the figures as a basis for distribution of federal funds under a number of financial assistance statutes.[3]

---

**2.** The defendants are the Secretary of Commerce, the Director of the Bureau of the Census, the President of the United States, and the Clerk of the House of Representatives.

**3.** According to a 1978 report, some 107 federal programs use census data or population figures developed from census data as a factor in allocating federal funds. B. Maffei, Staff of House Subcommittee on Census and Population of the Committee on Post Office and Civil Service,

95th Cong., 2d Sess., *Report on the Use of Population Data in Federal Assistance Programs* 11 (Comm. Print 1978). *See, e. g.*, State and Local Fiscal Assistance Act, 31 U.S.C. § 1221, *et seq.*; Comprehensive Employment and Training Act, 29 U.S.C. § 801 *et seq.*; Social Security Act, 42 U.S.C. § 301 *et seq.*; Community Development Act of 1974, 42 U.S.C. § 5301.

The population base used for apportionment purposes consists of a straightforward head count, as accurate as is reasonably possible, of all persons residing within a state on April 1.[4] This has been the practice since the first census in 1790; everyone is counted except foreign diplomatic personnel living on embassy grounds (which is considered "foreign soil," and thus not within any state) and foreign tourists, who do not "reside" here. The Census Bureau intends to make no effort to count separately the number of illegal aliens currently resident in the country, though it has undertaken a substantial effort to minimize undercounting of the minority groups which are likely to include illegal aliens.[5]

According to the plaintiffs, the number of illegal aliens within our boundaries has skyrocketed in the last decade. While no accurate data is available, most present estimates of their numbers range between three and eight million.[6] This is a large enough population that, plaintiffs allege, including illegal aliens in the apportionment base could cause a shift between states of between one and sixteen congressional seats, depending on concentrations in particular states and cities.

The constitutional core of plaintiffs' argument is that the phrase, "the whole number of persons," does not, in historical context, include illegal aliens, though they agree that the concept includes all *lawful* residents, citizen and alien alike. Their argument proceeds along the following lines. The concept of illegal aliens was unknown to the Framers; there *were* no illegal aliens for nearly a century thereafter when the first act excluding certain aliens (prostitutes and convicts) was passed. Act of March 3, 1875, 18 Stat. 477. Arguing that an intent to grant representation to persons unlawfully within the country therefore cannot logically be attributed to the Framers, the plaintiffs contend that inclusion of

4. The Census is conducted largely by mail, using two questionnaires. The "short form" asks seven questions about each person living in a particular residence; name, sex, birth date, marital status, relation to the person in whose name the dwelling is owned or rented, race, and whether the person is Hispanic. There are also a number of questions about the dwelling itself. There are *no* questions concerning citizenship. This form is sent to 80 percent of American households.

   The remaining 20 percent will receive "longform" questionnaires, containing dozens of additional questions. The long form does ask the country of birth and whether any household members born outside the United States are citizens. No questions are on either form from which an alien's legal status could be directly determined.

   If a census form is not returned by mail, a census taker will personally contact the household. There will also be a "Mission Night" and a three-week "casual count," during which census personnel will attempt to gather data on individuals with no regular home. See, for further explanations of how the census is conducted, Hacker, *The No-Account Census*, Harper's, March, 1980, at 28; Affidavit of V. Lance Tarrance, ¶¶ 5–9; Affidavit of Daniel B. Levine, ¶¶ 6–7.

5. The Bureau has devoted a great deal of time and effort to developing means to more accurately count the "hidden" population which has been missed in prior censuses. It has developed a bilingual questionnaire and undertaken a substantial public relations campaign designed to encourage response to the questionnaire and assure the population of the confidentiality of all answers. Special efforts have been made to hire census takers familiar with ethnic neighborhoods and able to speak the language of the people they will be contacting. It remains to be seen, of course, whether any or all of these efforts will bear fruit. For an analysis by the Census Bureau of the extent of the undercount problem, see "Estimates of Coverage of Population by Sex, Race and Age: Demographic Analysis," 1970 Census Evaluation and Research Program, Publication No. PHC(E)–4 (1974). See also U.S. Comm. on Civil Rights, *Counting The Forgotten* (1974).

6. No estimate of the size of the illegal alien population exists which is accepted as accurate or based on hard data. In a recent report, the Census Bureau reviewed the results of a number of different studies, identified the statistical shortcomings of each, and offered its own opinion that the illegal alien population is "almost certainly below 6.0 million, and may be substantially less, possibly only 3.5 to 5.0 million." *Preliminary Review of Existing Studies of The Number of Illegal Residents in the United States* 19 (1980). FAIR's Executive Director described these low estimates as "practically snatched out of the air," Washington Post, Jan. 31, 1980, at p. A15, and the plaintiffs contend here that the minimum possible illegal alien population is 5 million.

illegal aliens in fact defeats the purpose of apportionment; equal representation for equal numbers of "people of the United States." They request declaratory and injunctive relief, requiring the Census Bureau to use its "best efforts" to count illegal aliens separately and exclude them from the apportionment base.

The Bureau responds that it is constitutionally *required* to include *all* persons, including illegal aliens, in the apportionment base, insofar as an accurate count is reasonably possible. Furthermore, as a practical matter, it contends accurate methods to count illegal aliens do not presently exist, and would take months to develop, if it could be done at all. Intervenor New York State and amicus Mexican-American Legal Defense and Educational Fund argue that obtaining even a reasonably accurate count of the total population would be impossible if a simultaneous effort were made to count illegal aliens separately. The two goals are incompatible, according to the Bureau; any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count. Obtaining the cooperation of a suspicious and fearful population would be impossible if the group being counted perceived any possibility of the information being used against them. Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate. The Census Bureau's representations in this regard are supported by the amicus brief of the Mexican-American Fund, which has described for us the fears of persecution, particularly in Hispanic communities which it says would be exacerbated by the relief sought by the plaintiffs.

----

**7.** The prudential limitations on standing may bar the hearing of such cases, but we need not consider them here. The constitutional requirement of injury in fact, suffered by the plaintiff, is dispositive.

The failure of a plaintiff to establish injury in fact can arise in a number of different contexts. For example, the plaintiff may have failed to show that the action under attack has caused or will cause any actual harm at all, *Schlesin-*

## II. *Standing as a Jurisdictional Principle*

■ As a court of limited jurisdiction, our threshold inquiry must be to ensure that we are presented with a justiciable case, a "case or controversy" within the meaning of Article III. Part of the inquiry into whether a "case or controversy" exists must focus on whether any of the plaintiffs here have standing to present the issue discussed above. Standing is a complex issue, embodying both constitutional and prudential limitations on the exercise of the power of a federal court, but the initial question is whether the plaintiffs have established the indispensable constitutional minimum which must be present in every case, a concrete injury suffered personally by the party seeking relief. While the plaintiff need only allege "an identifiable trifle" of injury to overcome the constitutional barrier to invocation of the power of the courts, *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Supreme Court has emphatically held that there is no such thing as "citizen standing" or "issue standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Concern with or interest in an issue is simply not enough to entitle a litigant to demand resolution of a legal issue.

■ On the other hand, the mere fact that the injury is a small one, suffered generally by a large number of people, poses no absolute *constitutional*[7] barrier to standing, so long as the plaintiff is able to establish that he or she personally has suffered the claimed injury. There is no doubt that individuals claiming that their votes are diluted because their Representative represents a greater number of constituents than do other Representatives in the same assembly have standing to challenge the

----

*ger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) (challenge to members of Congress holding Armed Forces Reserves' commissions during their term of office); or, assuming that a substantial, cognizable injury has been shown, the plaintiff may have failed to show that he or she is among those who have sustained it. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Our discussion will focus primarily on the latter.

apportionment scheme. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In such a case, the question is "whether the claims of malapportionment . . . are in fact made by plaintiffs whose representation would be improved if those claims were to prevail." *Ripon Society v. Nat'l Rep. Party*, 173 U.S.App.D.C. 350, 355, 525 F.2d 567, 572 (1975) (en banc), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). As expressed by the court in *Baker v. Carr*, assuming that the plaintiffs' allegations assert a legally cognizable injury, it is enough for standing purposes that the plaintiffs "are among those who have sustained it." 369 U.S. at 208, 82 S.Ct. at 705.

In numerous cases in the Supreme Court deciding issues of standing, the same fundamental proposition is emphasized. A party who is unable to demonstrate that an interest of his or her own is at stake always lacks standing. We find that principle dispositive of this case, as shown in the following discussion.

III. *The Standing of These Plaintiffs*

In this case, the plaintiffs are the Federation for American Immigration Reform, the Committee for Representative Government (groups concerned with the alleged problems posed by our illegal alien population) and a group of legislators, some representing states with allegedly small illegal alien populations and others representing states with large illegal alien populations but areas thereof with small populations of un-

lawful residents. The allegations of injury are based on the plaintiffs' status as voters and lawful residents; no separate injury is alleged to be a result of some plaintiffs' status as Members of Congress. Furthermore, while the organizational plaintiffs allege standing "on their own behalf," no particular injury to them as organizations is alleged, and it is clear that they in fact appear solely as representatives of their members.[8] The plaintiffs' allegations as to standing are essentially that some one or more of them will likely suffer the loss of at least one national or state representative, and receive proportionately fewer federal benefits if the census proceeds as planned than if illegal aliens were counted and then eliminated from the apportionment base.

■ For purposes of our standing analysis, we must assume, as plaintiffs allege, that the census method and resulting apportionment is indeed unconstitutional in that illegal aliens should be separately counted and excluded from the apportionment base. We also must accept as true the plaintiffs' estimate that the contemplated method will result in the misallocation of from one to sixteen seats in Congress. Furthermore, it is undisputed that many states will use those same figures for their own internal apportionment, and that Congress will distribute some federal monies according to the total population as counted by the Census Bureau.[9]

8. The plaintiffs do assert that somehow counting illegal aliens in the census figures will "intensify and augment the movement to and residence in the United States of such persons," harming the plaintiffs' interest in the "just and full enforcement of [immigration] laws and in efforts to conform laws and policies governing immigration to modern-day demographic, economic and resource realities." Assuming that this would occur (and the plaintiffs offer us no explanation of the causal relationship involved) it is an example of the sort of "abstract interest" in a problem which the Supreme Court has made clear is insufficient to form a basis for standing. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). We assume, however, for purposes of this opinion, that if some of FAIR's members had standing, FAIR itself would be able to sue on their behalf as an organizational representative. *But cf. Ripon Society v. Nat'l Rep. Party*, 173 U.S.App.

D.C. 350, 355–56, 525 F.2d 567, 573–74 (1975) (en banc).

9. We will discuss this final issue only briefly. While Congress may well be distributing federal monies on the basis of undifferentiated population figures, that is its choice. The plaintiffs' allegation that it is irrational to distribute funds to states and localities on the basis of total population including illegal aliens and that they are being unlawfully discriminated against as a result of that choice lacks merit. Congress may choose any method of allocation it prefers, subject only to the constraints of the "rational relationship" test. *Ohio Bureau of Empl. Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977). The plaintiffs' argument seems ultimately to be that if Congress knew how many illegal aliens there were, it might choose to do things differently. That is up to

■ Given all these assumptions, the plaintiffs' showing as to standing is inadequate on a number of fronts. They have failed to demonstrate concrete harm which will occur and be suffered by any one of them, and they have also failed to demonstrate that the relief they request will benefit them personally. Indeed, it is impossible for them to do so, because of the way our method of apportionment operates. While the plaintiffs estimate that between one and sixteen congressional seats will be affected depending on the inclusion of illegal aliens, they can do no more than speculate as to which states might gain and which might lose representation. It may be Ohio which will gain; but on the other hand, it may be Alabama. Depending on how many illegal aliens there are, where they live, how accurate the census count is, and the interplay of all the other population factors which affect apportionment,[10] any of a

number of states might benefit by the relief requested by the plaintiffs; the only effect which seems inevitable is that California would lose seats, though again, how many is a matter of speculation. Therefore, *none* of the plaintiffs are able to allege that the weight of his or her vote in the next decade *will be affected* by the expected method of taking the census and apportioning congressional seats. Indeed the plaintiffs expressly concede this point; they point out for us that "prior to the conduct of the 1980 census and any intrastate reapportionment taken on the basis of tabulations, it is, of course, not possible to define precisely the parameters of the variances to result." Plaintiffs' Points & Authorities in Support of Preliminary Inj., at 22.[11]

■ The point is that plaintiffs' allegations are far too speculative to permit us to

Congress, not us; the means for requesting a calculation of the number of illegal aliens or excluding them from the basis for allocation of funds in specific statutory contexts are at its disposal, while we may order such a count only if it is statutorily or constitutionally required. In any case, we will not consider such a blunderbuss attack on the method Congress has chosen to distribute federal funds. Each statute serves different purposes, and if a plaintiff able to establish standing alleges in the context of a particular statute and its purposes that the choice made is irrational, we might have a case in a proper posture for consideration by a court. This is certainly not that case.

10. As we have pointed out, *supra* note 5, undercounting is a serious problem for the Census Bureau, while at the same time, small shifts in population can make a significant difference in apportionment, especially at the state level. For instance, though each Representative in Congress represents roughly half a million people, because of the use of the "method of equal proportions," by the time the last few congressional seats are allocated very small differences in population become decisive. The present 435th seat in Congress was awarded to Oklahoma rather than Oregon. If Oregon had had 250 more persons in its apportionment population, it would have been the other way around. Tarrance Aff., ¶ 20. Thus, very small movements of persons from one place to another can be important, ultimately as important as large settlements of aliens in New York City or Los Angeles. The effects which counting illegal aliens may have on apportionment are therefore not straightforward and numerical, but are diffused and may be negated entirely by other

population movements, such as the settlement of retirees in Florida, or of young professionals in Atlanta and Phoenix.

11. With regard to the alleged harm suffered as a result of local use of the census data for internal apportionment of state and local representatives, the case for finding standing in any one of the plaintiffs is not much stronger. However, in spite of the inadequate data, it seems likely that, for instance, Springfield, Illinois will be at a disadvantage in comparison to Chicago if Illinois uses census data for apportionment purposes. This issue need not detain us, however. So long as they meet the demands of the fourteenth amendment, the individual states have considerable flexibility in deciding how to set up their internal government, including reapportioning electoral districts. *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966). While many of them use census data to do so, all of them need not and do not. For example, Hawaii's use of registered voters as an apportionment base was upheld in *Burns*. Moreover, the defendants have no constitutional duty to supply the states information in any particular form and these defendants certainly do not have the power or authority to dictate to the states how they should apportion themselves. To the extent that use of census data for intrastate districting violates the law of any particular state as it has been alleged it does in California, or offends the dictates of the fourteenth amendment, the remedy is clearly not in this court against these federal defendants.

conclude that any *particular* plaintiff has an interest at stake in this proceeding and would benefit from the relief requested. It is not sufficient to allege that a plaintiff is one of a group, some of whom are likely to be injured. The fact that these plaintiffs share characteristics common to persons likely to be harmed is an insufficient basis for a conclusion that plaintiffs *themselves* will be harmed or their rights violated. They "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975).

Despite diligent search, we have been unable to find a single case in which standing was granted to a plaintiff because *some* harm was likely to occur and it *might* affect the litigant personally, and we have been referred to no such case. Indeed, in similar cases, the very problem with which we are faced here has been consistently identified as fatal to federal jurisdiction.

In *Warth v. Seldin*, for instance, one group of plaintiffs were low-income persons who sought to challenge the alleged exclusionary zoning practiced by Penfield, New York. Even assuming that the plaintiffs had alleged a constitutional violation by the defendants and that if the Court granted relief more housing would be available to low-income persons, the Court nevertheless concluded that the plaintiffs could not rest a claim to standing simply on the fact that they were members of that group:

> But the fact that these petitioners share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights. Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. Unless

these petitioners can thus demonstrate the requisite case or controversy between themselves personally and respondents, "none may seek relief on behalf of himself or any other member of the class." 422 U.S. at 502, 95 S.Ct. at 2207.

Similarly, in *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a group of black plaintiffs brought suit against certain public officials in Cairo, Illinois, alleging a pattern and practice of discriminatory conduct in the administration of the criminal justice system. The Supreme Court concluded that none of the plaintiffs had standing, though they were members of a group, some of which were likely to suffer from the alleged conduct in the future. The Court pointed out that granting standing to any particular plaintiff would rest the requirement of a personal, concrete injury on the possibility that that plaintiff may in the future violate the criminal law and be tried for his or her offense, in which event the plaintiff may appear before the defendants, and the defendants may then continue their discriminatory conduct to the plaintiff's detriment. Granting standing in such a case would, for all practical purposes, eliminate the requirement of injury in fact.

We conclude that granting standing in this case would involve resting the requirement of injury in fact on speculation and conjecture. For instance, most of the individual named plaintiffs are residents of Pennsylvania. In order to conclude that they have standing, we would have to assume that the Census Bureau will in fact be fairly successful in its efforts to include aliens in the census count, that the mathematical application of the method of equal proportions to the population figures will be affected by the inclusion of these figures, and that Pennsylvania will be among those states which will benefit. Interestingly enough, the plaintiffs have submitted charts showing their estimation of the effects on congressional apportionment given a variety of different possible assumptions about the illegal alien population. Among the charts which assume that the present

census figures *include* illegal aliens, Pennsylvania is only affected if there are in fact *eight million* illegal aliens in the country, a figure at the upper limits of available estimates. Furthermore, according to the plaintiffs' own calculations, the interests of the Representative from Vermont are not affected at all, no matter what the various assumptions about the size and distribution of the illegal alien population. This demonstration could be repeated for each of the named plaintiffs and each of FAIR's members; while we may assume, and indeed be convinced that there will be *some* effect on apportionment by the inclusion of illegal aliens in the population base, the plaintiffs have failed to demonstrate with requisite specificity where that effect will fall, so that we would be able to find a "concrete injury" to some particular resident of some particular state.

We are further bolstered in our conclusion by other cases dealing specifically with the census, in which standing was also denied. For example, in a case much like this one, the Second Circuit concluded that the plaintiff lacked standing. *Sharrow v. Brown*, 447 F.2d 94 (2d Cir. 1971), *cert. denied*, 405 U.S. 968, 92 S.Ct. 1188, 31 L.Ed.2d 243 (1972). Sharrow, a New York resident, sought to enjoin the failure of the Census Bureau to count and deduct the number of disenfranchised voters from the apportionment base, an explicit command of the fourteenth amendment. According to the plaintiff, the provision was adopted to deter the practice of some states of effectively eliminating the right of black citizens to vote through the use of various tests and taxes. By deducting all such disenfranchised citizens from the population figures, offending states would suffer the loss of congressional seats. However, apparently no effort has ever been made to actually conduct the census and apportionment in conformity with the fourteenth amendment.

The plaintiff alleged that as a resident of a state which did not attempt to limit the franchise, he would likely benefit from the relief sought because New York might receive one of the seats lost by the offending states. While the court agreed that if the plaintiff had established that this would in fact occur, he would have standing, it concluded that the plaintiff had failed to make an adequate showing that New York's delegation would be affected. The court acknowledged that standing would be virtually impossible to establish in a challenge to nationwide apportionment:

> For instance, to establish standing in the present case, Sharrow would have to show, at least approximately, the apportionment his interpretation of [section 2 of the fourteenth amendment] would yield, not only for New York but for every other State as well. This would necessitate a state-by-state study of the disenfranchisement of adult males, a task of great proportions. And even after approximate nation-wide reapportionment figures were derived, it might well be that, because of population shifts, or because New York itself disenfranchised a portion of its adult males, New York's representation would not be increased as Sharrow claims.

> .    .    .    .    .

> [The plaintiff's] sincere effort, an effort which we respect, to rectify what he considers a grave constitutional mistake is not enough. He must establish that the failure to enforce [section 2 of the fourteenth amendment] has resulted in a detriment to his rights of representation in Congress and this he has failed to do.

*Id.* at 97. *Accord, Lampkin v. Connor*, 239 F.Supp. 757 (D.D.C.1965), *aff'd on other grounds*, 123 U.S.App.D.C. 371, 360 F.2d 505 (1966). Similarly, in *Daughtrey v. Carter*, 190 U.S.App.D.C. 69, 584 F.2d 1050 (1978), the plaintiffs sought review of the presidential pardon of those who had left the country to avoid the draft. They alleged that the unlawful restoration of these persons' citizenship rights, and their ensuing votes, would dilute the weight of the plaintiffs' lawfully-cast ballots. The court of appeals affirmed the dismissal of the complaint because the plaintiffs had not alleged a personal injury:

They do not contend that their votes are diluted in any particular election or in any particular geographical area, nor do they contend that they are an identifiable group of voters whose votes are disfavored *vis-a-vis* those of some other group. At best the complaint alleges that as qualified voters of political subdivisions anywhere in the United States, appellants' votes in elections for any office, whether national, state, or local, are being diluted as a result of the reentry into the United States of an admittedly unknown, relatively small number of persons who allegedly should be excluded, and who therefore should not be entitled to vote.

*Id.* at 1056 (footnotes omitted).

Such cases are a far cry from the case relied on most heavily by the plaintiffs to support their claim for standing, *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). *Baker* was a challenge to the internal apportionment of Tennessee, the plaintiffs alleging that the drawing of district lines was so little tied to population that "a single vote in Moore County, Tennessee, [was] worth 19 votes in Hamilton County, [and] that one vote in Stuart or in Chester County [was] worth nearly eight times a single vote in Shelby or Knox County." 369 U.S. at 245, 82 S.Ct. at 725 (Douglas, J., concurring). The plaintiffs, as residents and voters in these more heavily populated and thus disadvantaged counties, sought relief "to protect or vindicate an interest of their own," and were "voters who allege facts showing disadvantage to themselves as individuals," a showing which was sufficient for the purposes of standing. While that case clearly established that even a very small "concrete injury," amounting to a slight dilution of the weight of a single vote, is sufficient to support standing, the case equally clearly required that the plaintiffs show that they will be among those who have sustained the injury.

In fact, the decision reemphasized the established rule that a plaintiff must be able to allege a personal stake in the outcome of the case. This the plaintiffs in this case have failed to do.

Another elementary component to standing is lacking here. The plaintiffs have failed to demonstrate that the relief they seek will redress the injury they assert. There must be a substantial likelihood that "the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed. 595 (1978); *Greater Tampa Chamber of Commerce v. Goldschmidt*, No. 79–1123 (D.C.Cir. Feb. 8, 1980). Plaintiffs seek an order requiring identification of the illegal aliens in residence and exclusion of them from the apportionment population, alleging that only in this way will an unconstitutional dilution of their right to vote be avoided. While they would leave the actual method of counting illegal aliens up to the Bureau's expertise, one way they have proposed to do so is to estimate the total number of aliens, based on a citizenship question in the census questionnaire, and then calculate the number of illegal aliens by comparison of that total with data from the Immigration and Naturalization Service of the number of aliens lawfully present in the country.

The problem is that the defendants have made a convincing showing that neither Census Bureau nor INS figures are accurate enough to permit such a calculation with any reasonable degree of accuracy. The Census Bureau has conceded that it has had a serious problem in obtaining accurate counts of minority populations. Indeed, use of plaintiffs' proposed method of calculation based on data from the 1970 Census results in a total illegal alien count of *minus 623,-000*.[12] While the Bureau has devoted large

12. By focusing on this single problem, we do not intend to downplay or ignore the other problems the defendants have raised with ordering the relief sought by the plaintiffs. For example, the very concept of "illegal alien"

amounts only to a vague notion of a person who might be deported if his or her presence were known to the authorities. But the determination of that legal fact can be a complicated process, as our numerous cases involving at-

amounts of research and resources to improving this performance, at this point its potential success is entirely speculative. It may well be, in spite of the Bureau's best efforts, that minority groups in general will continue to be undercounted to the point that inclusion of illegal aliens in the apportionment base is more a matter of theory than practice. In that event, this court will have decided a constitutional issue, ordered the expenditure of millions of dollars and caused substantial delay in the taking of the census, all with absolutely no effect on the plaintiffs' voting rights. Our jurisdiction may not rest on so ephemeral a possibility of relief.

Since we must assume—again for purposes of standing—that plaintiffs have in fact identified a constitutional error in our national apportionment, we are concerned by the possible objection that if these plaintiffs, at this time, cannot object to the Census Bureau's plans, no one will be able to raise the issue because the necessary data to establish standing will never be gathered. While that possibility is a matter of considerable apprehension to us, we have nevertheless been firmly admonished by the Supreme Court that it makes no difference to the fact that we lack jurisdiction that the case may never be decided if these plaintiffs lack standing. The plaintiff in *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) brought a constitutional challenge to the failure of the CIA to make a "regular Statement and Account" of its expenditures available to the public. The Supreme Court rejected standing based on the plaintiff's status as a citizen and taxpayer, noting that its decision likely meant that the issue would never be resolved.

> It can be argued that if respondent is not permitted to litigate this issue, no one can do so. In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts. The Constitution created a *representative* Government with the representatives directly responsible to their constituents at stated periods of two, four, and six years; that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the "ground rules" established by the Congress for reporting expenditures of the Executive Branch. Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls. Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them.

*Id.* at 179, 94 S.Ct. at 2947–2948.

We cannot ignore this directive, but in any case, it does not seem to us that this particular issue is forever shielded from exploration. While performing the calculations which would be necessary to show a substantial likelihood that a particular voter from a particular state would benefit from the relief here sought is indeed a formidable task, it is by no means clear that it will be impossible once the census returns are complete. At that time, it might be possible to show that there is a substantial

---

tempts by the INS to deport residents of this country demonstrate. The Immigration and Nationality Act is long and complex, full of provisos and exceptions. It would be absurd to expect the Census Bureau to develop figures, accurate enough to be used for the constitu-

tional purpose of apportionment, of the number of deportable aliens present in this country, and even more absurd to ask for those figures on a block-by-block basis, as is necessary for intrastate districting.

likelihood that a particular state, and thus a particular plaintiff, has suffered the requisite "concrete injury" required by article III, in that the procedures used have resulted in the loss of one or more congressional seats.[13] If a plaintiff should prevail in a constitutional challenge at that point, we do not believe the courts would be unable to grant effective relief.

Furthermore, there is no assurance that the necessary data will never be gathered by the Census Bureau, though it does not plan to do so now. Congress may request figures on illegal aliens at any time, and the Bureau would then be obliged to use its best efforts to develop accurate figures.[14] We note that the individual plaintiffs who include members of Congress are not without political power and legislative authority; a large number of states and congressional districts are potentially adversely affected by the inclusion of illegal aliens in the apportionment base. The individual legislators thus have a ready-made forum in which to express their views and seek resolution of the issues involved in this suit.

IV. *The Case for Equitable Relief*

■ In light of the shortness of time remaining before the census is underway, and mindful of the fact that the plaintiffs may wish to seek review of our decision, we believe that it would not be imprudent for us also to indicate that we believe the plaintiffs have failed to establish their entitlement to equitable relief at this time. *Cf., O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 699, 38 L.Ed.2d 674 (1974) (after finding no standing, Court went on to find no basis for equitable relief). The defendants have made a convincing showing that forcing it to attempt a separate head count of illegal aliens would be extremely expensive, delay the census by as much as a year, and likely be ineffective in any case. Furthermore, in a recent affidavit filed with this court, the plaintiffs themselves eliminate any possibility of this court's granting injunctive relief at this time. In the Supplemental Affidavit of V. Lance Tarrance, plaintiffs' expert, filed with the plaintiffs' motion for summary judgment, Mr. Tarrance attempts to answer the defendants' objections as to cost and delay:

> [S]everal alternatives avoiding these difficulties suggest themselves. Perhaps the most basic is *reliance only on the citizenship data generated by the questions already appearing on the long form.* These forms will be sent to more than 17 million households nationwide, and, if the practice in 1970 is followed, they will be distributed on a uniform basis throughout the country. These responses will provide data from which the Bureau could, for each census tract, statistically generate an estimate of the number of persons who were born outside the U.S. and are not naturalized citizens, *i. e.,* aliens. Comparing this figure with INS geographic data on legal aliens would then result in a figure on the number of illegal aliens in that census tract. This would involve no reprinting, disassembly of packages, staff retraining or any other of the preparatory steps said to cost $150 million and delay the census for up to a year.

(emphasis added). It thus appears that the plaintiffs would be satisfied with *no change at all* in the proposed census, so long as an estimate of the number of illegal aliens in each census tract is prepared and subtracted from the population base before the apportionment of congressional seats. This effectively eliminates any basis for equitable relief at this time.

---

**13.** We also note that the same litigant who sought review in *Sharrow v. Brown,* discussed above, had earlier raised a challenge to the Census Bureau's failure to count disenfranchised citizens, and had obtained standing by refusing to complete his census form, raising his constitutional challenge as a defense to the subsequent prosecution. (He lost on the merits.) *U.S. v. Sharrow,* 309 F.2d 77 (2d Cir. 1962), *cert. denied,* 372 U.S. 949, 83 S.Ct. 939, 9 L.Ed.2d 974 (1963).

**14.** We need not decide whether Congress could, consistent with the fifth amendment, require the Census Bureau to directly ascertain the resident status of individual aliens under threat of punishment should answers be refused. Brief of State of New York at 4.

**576**

Furthermore, at least in the abstract, plaintiff's case appears to be very weak on the merits. The language of the Constitution is not ambiguous. It requires the counting of the "whole number of persons" for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly "persons." By making express provision for Indians and slaves, the Framers demonstrated their awareness that without such provisions, the language chosen would be all-inclusive. According to James Madison, the apportionment was to be "founded on the aggregate number of inhabitants" of each state. *The Federalist*, No. 54, at 369 (J. Cooke ed. 1961). The Framers must have been aware that this choice of words would include women, children, bound servants, convicts, the insane—and aliens, since the same article of the Constitution grants Congress the power "to establish a uniform rule of naturalization." Art. I, section 8, cl. 4. We see little on which to base a conclusion that *illegal* aliens should now be excluded, simply because persons with their legal status were not an element of our population at the time our Constitution was written.

The defendants' interpretation of the constitutional language is bolstered by two centuries of consistent interpretation. The Census Bureau has always attempted to count every person residing in a state on census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders. The issue of the inclusion of aliens in the apportionment base has received explicit congressional attention, both at the time of the adoption of the fourteenth amendment and more recently. *See, e. g., Cong. Globe*, 39th Cong., 1st Sess. 359 (1866) (remarks of Rep. Conkling). Although the language "the whole number of persons" finally adopted in the fourteenth amendment is identical to the original choice of words in article I, section 2, other options were considered and expressly rejected, after considerable debate, including the options of "voters" or "citizens." While, as a political matter, the reason seems to have been that any change would have diluted the power of the New England States which had a large number of women and aliens ineligible to vote, *see* Van Alstyne, *The Fourteenth Amendment, The "Right" to Vote, and The Understanding of The Thirty-Ninth Congress*, 1965 S.Ct.Rev. 33 (1965), it was also pointed out during debate that the "non-voting classes" have a vital interest in the conduct of the Government. *Cong. Globe*, 39th Cong., 1st Sess. 141 (1866) (remarks of Rep. Blaine). In any case, it appears indisputable that Congress was aware of the all-inclusive scope of the language it was adopting.

During the first half of this century, a variety of proposals were made to exclude aliens from the apportionment base, and it appears to have been generally accepted that such a result would require a constitutional amendment.[15] See, for example, the 1929 advice from the legislative counsel for the Senate, concluding that statutory exclusion of aliens from the apportionment base would be unconstitutional. 71 Cong.Rec. 1821 (1929). In 1940, in the course of debate of the same issue, the subject of *illegal* aliens was raised. Asked whether "aliens who are in this country in violation of law have the right to be counted and represented," Representative Celler of New York responded:

> The Constitution says that all persons shall be counted. I cannot quarrel with the founding fathers. They said that all should be counted. We count the convicts who are just as dangerous and just as bad as the Communists or as the Nazis, as those aliens here illegally, and I would not come here and have the temerity to say that the convicts shall be excluded, if the founding fathers say they shall be included. The only way we can exclude them would be to pass a constitutional amendment.

---

15. *See, e. g.*, H. J. Res. 20, 71st Cong., 1st Sess. (1929); H. J. Res. 97, 72d Cong., 1st Sess. (1932).

86 Cong.Rec. 4372 (1940). The proposal to exclude aliens from the population base was rejected.

Furthermore, the plaintiffs' basic premise that the principle of "one person, one vote" is being violated by the inclusion of illegal aliens in the apportionment base is conclusory. They argue that their votes are "worth less" than the votes of citizens of states with large illegal alien populations, but that argument assumes the conclusion that illegal aliens should not be counted, the very question which the plaintiffs seek to have us decide.

In any case, the "one person, one vote" rule, announced and developed in the context of challenges to a state's internal districting, has little to offer us here. While the same underlying principle, equal representation for equal numbers of people, applies to both national apportionment and intrastate districting, the mathematical notion of one person, one vote has no applicability to the national issue.[16] "Equal representation" is only a rough goal in national apportionment, since every state must have at least one representative, state lines must be respected in allocating congressional seats, and each state has the right to establish its own voting requirements, within constitutional limits.

Finally, we note that plaintiffs' complaint was filed only a few short months before the statutorily required date of the census, when any changes would inevitably result in disruption of the process, delay and expense. Three years ago, Congress was advised of the subjects to be covered, and two years ago it was provided the specific questions which would be asked. There would be no justification for our exercise of equitable powers to respond to plaintiffs' eleventh hour challenge to those subjects and questions.

Given these considerations, even if the plaintiffs were able to establish standing to bring this lawsuit, we would be inclined to deny them the relief they seek. Both the equities of the situation and the merits of the case favor the defendants.

## V. The Propriety of a Three-Judge Court

■ This three-judge court was convened pursuant to recently amended 28 U.S.C. § 2284 (1976), which now prescribes such courts only "when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." In light of our deliberations and after hearing further argument on the propriety of such a designation, we have concluded that the issue is most likely one for a single district judge. This case does not seem to us to involve an action "challenging the constitutionality of the apportionment of congressional *districts*." *Id.* (emphasis added). Nor did the drafters appear to have intended to cover cases such as this which do not directly affect state reapportionment. See *S.Rep.No.* 93–206, 93rd Cong., 1st Sess. 13 (1973) (revision intended to apply to actions "challenging the constitutionality of any *statute* apportioning congressional districts" (emphasis added)). Here the challenge is to census practices which will produce data on which the apportionment of House of Representative members to states will be based, not to any state action reapportioning congressional districts. *Cf. Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Somewhat similar challenges in the past to census practices potentially affecting allocations of House members to states have been decided by single judge courts. *See, e. g., Lampkin v. Connor,* 239 F.Supp. 757 (D.D.C. 1965), *aff'd on other grounds,* 360 F.2d 505 (D.C.Cir.1966); *Sharrow v. Brown,* 319 F.Supp. 1012 (S.D.N.Y.1970), *aff'd,* 447 F.2d 94 (2d Cir. 1971); *Borough Bethel Park v.*

---

**16.** We also note that the phrase itself is inaccurate shorthand for the concept of equal representation for equal numbers of people, insofar as it is possible. State districts drawn strictly on the basis of population would clearly be constitutional, *Reynolds v. Sims,* 377 U.S. 533, 567 (1964), in spite of the fact that concentrations of non-voting residents in a few districts (such as where prisons or orphanages are located) would make the ballots of voters in those districts more "valuable" than voters' ballots in other districts.

*Stans,* 319 F.Supp. 971 (W.D.Pa.1970), *aff'd,* 449 F.2d 575 (3d Cir. 1971).

Although we conclude that a three-judge court is not necessary and the issue may properly be decided by a single judge, we are concerned, in view of the imminence of the census which is scheduled to begin within a few weeks, that the case be promptly decided and the parties have time to take an appeal. Hence we have adopted a procedure which has been previously approved by the Supreme Court, *see Swift & Co. v. Wickham,* 382 U.S. 111, 114 n.4, 86 S.Ct. 258, 260, 15 L.Ed.2d 194 (1965); *Query v. United States,* 316 U.S. 486, 488, 62 S.Ct. 1122, 1123, 86 L.Ed. 1616 (1942); and cited with approval in our own jurisdiction; *Krebs v. Ashbrook,* 275 F.Supp. 111, 119 (1967) (3-judge court, Bazelon, C. J., Fahy, J. & Corcoran, D. J.), *aff'd,* 132 U.S.App. D.C. 176, 407 F.2d 306 (1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 619, 21 L.Ed.2d 570 (1969); *cf. Jackson v. Choate,* 404 F.2d 910 (5th Cir. 1968). We have reached a unanimous decision disposing of the case on grounds of lack of standing; District Judge Gasch additionally certifies that he individually arrived at the same conclusion that we collectively reached. This is done "out of abundant caution," *Swift & Co. v. Wickham,* 230 F.Supp. 398, 410 (S.D.N.Y.1964), so that in the event we are mistaken, an appeal can still be expeditiously taken in the appropriate forum. *See, Krebs v. Ashbrook,* 275 F.Supp. at 119; *Swift & Co.,* at 410.

### VI. *Conclusion*

Since we conclude that the plaintiffs lack standing, and that in any case they have failed to demonstrate that they are entitled to the exercise of our equitable powers, defendants' motion for summary judgment is granted and plaintiffs' motions for preliminary injunction and for summary judgment are denied.