ALDWIN H. SEEFELDT, Corporation Counsel, Washington County
You request my opinion on a number of questions concerning the extent to which a county board must, when reapportioning its supervisory districts, adhere to the municipal boundary criteria set forth in sec. 59.03 (2) (b), Stats.
Section 59.03 (2) (b), Stats., provides as follows: *Page 439 
"(b) Creation of supervisory districts. The countyboard in each county shall establish and numbersupervisory districts, after a public hearing, in such amanner that each supervisor shall represent as nearly aspracticable an equal number of persons, but considering such other factors as continuity of interest, compactness and contiguity of existing town, village and city lines. More than one municipality may be placed in any supervisory district and more than one district may be formed within a municipality. Whenever conditions arise where creation of a supervisory district based primarily on population cannot be achieved without violating municipal boundary lines, but where a combination of 2 or more municipalities could be established creating a supervisory district of approximately double the population average of the other supervisory districts, the county board may create such a supervisory district and designate that 2 supervisors be elected from such a district." (Emphasis added)
You first inquire as follows:
"Is the statutory criteria to adhere to municipal boundary lines as definitely implied by the language of Wis. Stats., § 59.03 (2) (b) to be regarded as unconstitutional and therefore, to be ignored if strict adherence to it results in districts which have an unacceptably wide deviation of population?"
In establishing supervisory districts, the county board is required to insure that "each supervisor shall represent as nearly as practicable an equal number of persons." This legislative directive simply emphasizes the equality of representation required under both Art.I, sec. 1, Wis. Const., and under the equal protection clause of the Fourteenth Amendment to the United States Constitution. State ex rel. Sonneborn v. Sylvester
(1965), 26 Wis.2d 43, 132 N.W.2d 249. Naturally, therefore, the principle of equal representation is first among the various considerations in any county reapportionment. As you point out, however, the legislature did not view the task of achieving equal representation as necessarily inconsistent with adherence to certain standards, among them, the goal of utilizing town, village and city lines, if possible. *Page 440 
The February 3, 1965, Report of the County Board Representation Committee to the 1965 Legislature described the various standards to be followed in county board reapportionment under the above statute, as follows, at page 5:
"Consistent with the legislative directive to the study committee, s. 59.03 (2) (b) of S.B. 1 directs the county boards to establish supervisory districts which will `represent as nearly as practicable an equal number of persons.' This paragraph of the bill also sets forth other standards which the boards must consider in setting up the new districts. These include:
"(1) continuity of interest:
"(2) compactness; and
"(3) contiguity of existing town, village and city lines.
"Recognizing that the distribution of population within individual counties is uneven, the committee concluded that apportionment of `equal population' supervisory districts would be feasible only if the counties are permitted some flexibility in determining the boundaries of the new districts. Therefore, par. (b) provides that:
"(1) more than one municipality may be placed in any supervisory district;
"(2) more than one district may be formed within a municipality; and
"(3) under special circumstances [set forth in some detail in s. 59.03 (2) (b)], 2 supervisors may be elected from a single district."
In order to provide county boards with the flexibility necessary to create districts of nearly equal population, which also follow municipal boundary lines, the legislature has made it clear that counties can place more than one whole municipality within one district or create more than one whole district within a municipality.
Furthermore, the legislature appears to have anticipated that situations would arise where honoring municipal boundary *Page 441 
lines would not be possible if the county board was to insure equal representation. It has apparently attempted to respond to this possibility by authorizing the election of two supervisors at large from a district comprising two or more municipalities, constituting approximately double the population average of the single member districts, if such would assist in apportioning county supervisory districts on town, village and city lines.
I am aware that some counties may have been reluctant to utilize multi-member districts in the past, fearing that the election at large of two supervisors from a single district would be challenged as an attempt to dilute the representation of certain segments of the voting populace. However, despite initial fear that the use of multi-member districts might not be upheld by the courts, attacks on apportionment plans utilizing this type of district elsewhere have not met with general success, at least where such districts have contained no built-in bias nor operated to impair the voting strength of any particular racial or political element of the voting population. The law on the subject of multi-member district was quite recently outlined by the United States Supreme Court in Whitcomb v. Chavis
(1971), 103 U.S. 124, 91 S.Ct. 1858, 29 L.ed. 2d 363, at pp. 375-76, as follows:
"The question of the constitutional validity of multi-member districts has been pressed in this Court since the first of the modern reapportionment cases. These questions have focused not on population-based apportionment but on the quality of representation afforded by the multi-member district as compared with single-member district. In Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.ed. 2d 632
(1964), decided with Reynolds v. Sims, we noted certain undesirable features of the multi-member district but expressly withheld any intimation `that apportionment schemes which provide for the at-large election of a number of legislators from a county, or any political subdivision, are constitutionally defective.'377 U.S. at 731, n. 21, 84, S.Ct., at 1471. Subsequently, when the validity of the multi-member district, as such, was squarely presented, we held that such a district is not per se illegal under the Equal Protection Clause. [Cases cited.] That voters in multi-member *Page 442 
districts vote for and are represented by more legislators than voters in single-member districts has so far not demonstrated an invidious discrimination against the latter. But we have deemed the validity of multi-member district systems justiciable, recognizing also that they may be subject to challenge where the circumstances of a particular case may `operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' Fortson,379 U.S., at 439, 85 S.Ct., at 501, and Burns,384 U.S., at 88, 86 S.Ct., at 1294 . . . . But we have insisted that the challenger carry the burden of proving that multi-member districts unconstitutionally operate to dilute or cancel the voting strength of racial or political elements. We have not yet sustained such an attack."
There do appear to be certain benefits which result from attempting to establish supervisory district lines along existing municipal boundaries. First, if such lines are followed, there may be less temptation to gerrymander. At least, it would seem probable that following such lines would most likely result in a more compact district consisting of people with an identifiable community of interest. Thus, following existing town, village and city boundary lines may result in also satisfying the other standards set forth by the legislature in sec. 59.03 (2) (b), Stats. It should also be appreciated that voting precincts do normally follow municipal boundary lines. Should a supervisory district sever the precinct, the conduct of an election for county board supervisor in that precinct becomes more complicated because precinct election officials must service electors voting for candidates for county board supervisor from the two or more districts lying within the precinct, unless the problem can be resolved by the division or consolidation of election precincts under the provisions of sec. 5.15, Stats.
The emphasis of our legislature on the importance of existing town, village and city boundaries appears to have had some early, if guarded, acceptance in Reynoldsv. Sims (1964), 377 U.S. 533, 84 S.Ct. 1362, 12 L.ed. 2d 506,537, where the court indicates that the use of political subdivision lines is constitutionally valid ". . . so long as the resulting apportionment [is] one based substantially on population and *Page 443 
the equal-population principle [is] not diluted in any significant way. . . ." More recently, there has been further indication that the court will accept efforts to maintain the identity of local governmental units where compatible with the general principle of population equality. Thus, in Abate v. Mundt (1971), 403 U.S. 182,91 S.Ct. 1904, 29 L.ed. 2d 399, 402-403, the following is stated:
"In assessing the constitutionality of various apportionment plans, we have observed that viable local governments may need considerable flexibility in municipal arrangements if they are to meet changing societal needs, Sailors v. Kent Board of Education,387 U.S. 105, 110-111, 18 L.ed. 2d 650, 654, 655,87 S.Ct. 1549 (1967), and that a desire to preserve the integrity of political subdivisions may justify an apportionment plan which departs from numerical equality. Reynolds v. Sims, 377 U.S. 533, 578,12 L.ed. 2d 506, 536, 84 S.Ct. 1362 (1964). These observations, along with the facts that local legislative bodies frequently have fewer representatives than do their state and national counterparts and that some local legislative district may have a much smaller population than do congressional and state legislative districts, lend support to the argument that slightly greater percentage deviations may be tolerable for local government apportionment schemes, cf. Reynolds v. Sims, supra, at 578, 12 L.ed. 2d at 536. Of course, this Court has never suggested that certain geographic areas or political interests are entitled to disproportionate representation. Rather our statements have reflected the view that the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality."
Although the Abate case dealt with the reapportionment of a county board of supervisors, the case dealt with New York law and I consider the population variation approved by the court in that instance, i.e., a total deviation from equality of 11.9 percent, probably unacceptable under the law and system of local government in existence in Wisconsin today. Not only did the court emphasize the extremely limited application of its decision, but it is evident that the peculiar circumstances upon which the court relied in justifying such population variation do not exist in our state. *Page 444 
However, the case does point out the continuing willingness of the court to accept, as feasible, reapportionment plans which emphasize utilization of municipal boundary lines.
In direct response to your first question, then, it is my opinion that the statutory directive in sec. 59.03
(2) (b), Stats., to adhere to existing town, village and city boundary lines in the course of structuring county supervisory districts upon reapportionment, is not unconstitutional, and that such requirement must be adhered to "so long as the resulting apportionment [is] one based substantially on population and the equal-population principle [is] not diluted in any significant way." Reynolds v. Sims, supra, 12 L.ed. 2d, at page 537. It should be appreciated, however, that municipal boundary line criteria may be unconstitutionally applied.
Your second question asks:
"If it is determined that municipal boundary lines may be disregarded in the interest of more equalized population per district, what criteria shall be used to estimate population for the purpose of splitting municipalities?"
In addition to the two-member district discussed above, most counties have the ability to alter the number of county board supervisors, and therefore supervisory districts, under the provisions of sec. 59.03
(2) (a), Stats. However, I fully realize that despite this flexibility, county boards may not be able to utilize existing town, village and city lines in establishing supervisory districts and at the same time insure that each qualified voter be given a vote which is equally weighted, insofar as is practicable, with votes cast by all other electors in the county. Under such circumstances, of course, existing town, village and city lines not only may be disregarded, but must be disregarded in order to insure a constitutional apportionment of the county board.
However, this does not mean that the county board may resort to "estimates" of population for the purpose of splitting municipalities. Section 59.03 (2) (c), Stats., provides as follows:
"(c) Apportioning supervisory districts. Following each federal decennial census the secretary of state shall certify *Page 445 
to each county board chairman the population of each town, village and city in the county. As soon as practicable but not more than one year after receiving the population certification, the county board in each county shall apportion county supervisory districts as provided in par. (b) and the chairman of the county board shall file a certified copy of the apportionment plan with the secretary of state."
The requirement that such apportionment be made following each Federal decennial census quite clearly indicates that the census so taken is to be the basis of such apportionment. This view is consistent with that expressed in an early decision or the Wisconsin Supreme Court concerning similar language in our Wisconsin Constitution referring to apportionment of the legislature. In that case, State ex rel. Lamb v.Cunningham, Secretary of State (1892), 83 Wis. 90,53 N.W. 35, the court said, at page 140:
"`. . . It seems to be well established that courts will take judicial notice of a census, whether taken under the authority of the state or United States . . . . The apportionment is to be "according to the number of inhabitants," and made at the next session after the state or United States enumeration; and the enumerationis evidently intended as the basis of apportionment. The court will take judicial knowledge of the location, general boundaries, and the juxtaposition of the several counties, towns, and wards mentioned in the act in question, and of matters of common knowledge.' . . .
"Thus it is very obvious, under the rulings of this court in the previous case, [State ex rel. AttorneyGeneral v. Cunningham (1892), 81 Wis. 440, 510, 51 N.W. 724] that it is not permissible for the defendant here to allege and prove that in making the last apportionment the legislature acted upon the theory that the counties of Chippewa, Florence, Forest, Oneida, Langlade, Price, and Taylor contained 12,777 more inhabitants than appears from the census of 1890, for to do so would open the door on the other side to prove that the other counties of the state, or some of them, contained less inhabitants than appears from the census. Besides, if proved, it would only show that the legislature purposely disregarded the standard of population thus conclusively fixed *Page 446 
by the constitution, and based their action upon other computations, estimates, or considerations. . . ."
It must be admitted at the outset that the rules utilized by the Federal Bureau of the Census to establish population statistics leave much to be desired for basic apportionment purposes. The report of the bureau designated "U.S. Census of Population: 1970 NUMBER OF INHABITANTS Final Report PC(1)-A51 WISCONSIN," at page 111, in fact, supports this general appraisal of the census data:
"USUAL PLACE OF RESIDENCE
"In accordance with census practice dating back to 1790, each person enumerated in the 1970 census was counted as an inhabitant of his usual place of residence, which is generally construed to mean the place where he lives and sleeps most of the time. This place is not necessarily the same as his legal residence, voting residence, or domicile. In the vast majority of cases, however, the use of those different bases of classification would produce substantially the same statistics, although there may be appreciable differences for a few areas."
Likewise, although the United States Supreme Court has demanded "equal population" as the basis for apportionment, the court has not defined what it means by population. Thus, in Burns v. Richardson (1966), 384 U.S. 73,91, 86 S.Ct. 1286, 16 L.ed. 2d 376, 390, the court indicates:
". . . We start with the proposition that the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. . . ."
However, although some other type of population basis may be constitutionally permissible, in Wisconsin the total population figures derived from the Federal decennial census has been established as the basis for apportionment. In the absence of demonstrated fraud, etc., then, such data should be utilized without alteration or adjustment. *Page 447 
The data obtained as a result of the 1970 Federal census contains highly detailed breakdowns of population in most areas, including population breakdowns which follow lines other than municipal boundary lines. Aside from legal considerations, therefore, the quality and detail of the current census appears to have eliminated any need for estimates of populations. If it is not possible to follow existing town, village and city boundary lines, other lines developed as part of the census data itself should be utilized. However, in those few counties where population is so sparse that no census breakdown of population within individual municipalities exists, the county board should rely on the use of the two-number district and their authority to alter the number of supervisors to insure that representation falls within constitutional limits.
Your third question asks:
"Does Wis. Stats., § 59.03 (2) (b) require a county board to adopt a plan providing for a larger number of supervisors (but within the statutory maximum) if that plan violates fewer municipal boundary lines, than an alternate plan providing for fewer supervisors, assuming that both plans have the same (acceptable) percentage of deviation in population?"
There are, of course, a great many factors which affect whether or not a particular apportionment plan will ultimately be found acceptable. One of the variables available to assist county boards in achieving an equitable reapportionment which complies with the various requirements of sec. 59.03 (2) (b), Stats., is the ability of the board to alter the number of county supervisory districts. This power should be utilized to insure the most rationally designed plan possible. The "percentage of deviation" in population of each proposed district from the mean or theoretically ideal average district, is only one of several tests which are utilized to measure the quality of an apportionment effort. No one test can be said to accurately determine the validity of a plan under consideration.
Assuming that two different plans of apportionment were otherwise identical, sec. 59.03 (2) (b), Stats., would clearly *Page 448 
require that the county board adopt that plan which more closely adhered to existing town, village and city boundary lines. Furthermore, generally speaking, all else being equal, if a greater adherence to principles of equal representation as well as adherence to such boundary lines can be achieved by adjustments in the number of supervisors, it appears that the statute contemplates that the county board will attempt to adjust the number of supervisors so as to achieve those desired results.
As has so many times been pointed out by our courts, apportionment is essentially a legislative matter. The apportionment plan must not only be the most equitable practicable, but it must also be rationally designed. It represents, after all, an exercise of legislative judgment and a weighing of various priorities. Therefore, just as the courts have refrained from laying down any hard and fast rules dictating the degree of mathematical exactitude required in legislative apportionment, this office must refrain from dictating the extent to which county boards must utilize their ability to change the number of county supervisors to affect the legitimate goals of reapportionment.
Your last question asks:
"Same situation as #3, but the plan providing for fewer supervisors, while violating more municipal boundary lines, results in a smaller percentage of deviation in population?"
My response to your third question is obviously also largely applicable to this question as well. I would point out, however, that the principal purpose of reapportionment and the overriding consideration at all times is the assurance of equal representation. A particular plan should satisfy this as well as all the other statutory requirements of county apportionment set forth in sec. 59.03 (2) (b), Stats., if possible. However, where it becomes evident that an otherwise legitimate standard competes with the primary function of reapportionment, i.e., equality of voting power, then the course of action must be followed which favors the latter.
RWW:JCM *Page 449