MARCEL DANDENEAU, Chief Clerk State Assembly
On behalf of the Committee on Assembly Organization, you have submitted the following opinion request concerning the inclusion or exclusion of institutionalized populations for reapportionment purposes:
 The results of the 1980 federal Census of Population, to be certified to the State of Wisconsin on or before April 1, 1981, Will include institutionalized populations in a number of municipalities. In some instances, such institutionalized populations, though "inhabitants" of this state, are constitutionally disenfranchised by Section 2 of Article 111 of the Wisconsin Constitution; e.g. convicted felons or persons "non compos mentis or insane."
 QUERY: How are institutionalized populations to be treated, for the purpose of equal population redistricting based on the results of the 1980 CENSUS
[sic] of Population:
(a) for congressional redistricting;
(b) for state legislative redistricting;
 (c) for redistricting of county supervisory districts; and
(d) for redistricting of city aldermanic districts?
Congressional Redistricting
United States Constitution art. 1, sec. 2, clause 3, as amended by sec. 2 of the fourteenth amendment to the United States Constitution, provides in part: "Representatives . . . shall be apportioned among the several States . . . according to their respective numbers, which shall be determined by adding . . . the whole number of free persons . . .[1] *Page 82 
United States Constitution art. I, sec. 2, further provides in part that: "The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct."
Although it has not squarely decided the issue, the United States Supreme Court has directly questioned "whether distribution of congressional seats except according to total population can ever be permissible under Art. I, 2." Kirkpatrickv. Preisler, 394 U.S. 526, 534 (1969). And for purposes of congressional apportionment and representation under the provisions of U.S. Const. art. I, sec. 2, population has in fact been treated as the apparent singular controlling factor to be considered. Reynolds v. Sims, 377 U.S. 533, 567 (1964). Thus, inWesberry v. Sanders, 376 U.S. 1, 8-9, 13-14 (1964), the court discusses the matter as follows:
 The history of the Constitution, particularly that part of it relating to the adoption of Art. I, 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives.
. . . .
 The debates at the Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent "people" they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants. The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure "fair representation of the people," an idea endorsed by Mason as assuring that "numbers of inhabitants" *Page 83 
should always be the measure of representation in the House of Representatives.
Congress has consistently provided, by law, for the implementation of the enumerations contemplated by the United States Constitution. The Census Act which governs the current decennial census, provides, in part, as follows:
 (a) The Secretary [of Commerce] shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year, which date shall be known as the "decennial census date".
 (b) The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States.
13 U.S.C. § 141.
The detail of the enumeration is delegated by Congress.13 U.S.C. § 4 and 5. After the President receives the decennial report from the Secretary of Commerce, "the President shall transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment." 2 U.S.C. § 2a(a). Congress, in turn, reports such information to the chief executive of each state. 2 U.S.C. § 2a(b).
Historically, the "whole number of persons in each State, " under the Constitution and the various acts of Congress, has been interpreted by the Bureau of the Census to include those persons whose usual place of residence is in a particular state on the date of the census, and, in addition, those persons present in the state who have no usual place of residence. See Borough ofBethel Park v. Stans, 449 F.2d 575, 578 (3rd Cir. 1971). The basic criterion used by the Bureau of the Census to determine such usual place of residence is that persons are enumerated at the place in which they generally eat, sleep, and work, and that persons are counted as residents of their *Page 84 
usual place of abode even though temporarily absent therefrom. This criterion was held by the court in Borough of Bethel Park to be a reasonable means of interpreting said constitutional and legislative mandate to enumerate the "whole number of persons in each State." 449 F.2d at 578.
More specifically, for the purpose of determining institutionalized populations under the 1980 decennial census, persons are considered as residents of institutional group quarters under the following rule:
 These are persons under care or custody at the time of enumeration. They are persons in homes, correctional schools, specialized hospitals, or wards for juveniles, the physically handicapped, or the mentally handicapped; persons in homes or hospitals for mental, tuberculosis, or other chronic diseases; residents of homes for unmarried mothers, nursing (convalescent and rest) homes; homes for the aged and dependent; and correctional institutions. These persons are enumerated as residents of an institution — regardless of their length of stay in the particular place.
United States Bureau of the Census, 20th Decennial Census-1980,Questionnaire Reference Book (D-561), at 90.
The method of counting institutionalized persons, as well as the propriety of counting aliens and persons otherwise denied the right to vote, under the foregoing criteria for determining total population for congressional reapportionment purposes, has been upheld in a number of court challenges. Generally, these cases have been decided on the basis of lack of standing or lack of evidentiary support.
In Borough of Bethel Park, the court concluded that the Bureau of the Census acted rationally in enumerating persons confined to institutions where individuals usually stay for long periods of time (such as penitentiaries or correctional institutions, mental institutions, homes for the needy or aged or hospitals for the chronically ill) as residents of the state where confined.449 F.2d at 582.
In addition, it has been held that under the present state of the law, Congress is not required to prescribe that the census includes information *Page 85 
relating to disenfranchisement. United States v. Sharrow,309 F.2d 77, 79-80 (2d Cir. 1962), cert. denied 372 U.S. 949 (1963). In fact, the present federal statutes relating to the census and the apportionment of Representatives in the House of Representatives neither direct nor authorize the Bureau of the Census to exclude disenfranchised citizens in taking the census or to compute a statement showing a reapportionment of Representatives on the basis of such exclusion. See Lampkin v.Connor, 239 F. Supp. 757, 766 (D.D.C. 1965), aff'd on othergrounds, 123 U.S. App. D.C. 371, 360 F.2d 505 (1966).
Finally, more recently it was held that the constitutional requirement of counting the "whole number of persons" for congressional apportionment purposes includes both illegal as well as legal aliens. Federation For Am. Imm. Reform v.Klutznick, 486 F. Supp. 564 (D.D.C. 1980), appeal dismissed forwant of jurisdiction, 100 S.Ct. 3005 (1980). This case arose in the context of the 1980 decennial census, which was conducted largely by mail, using two questionnaire forms. One form, sent to eighty percent of American households, contained no questions concerning citizenship, and the remaining form would not directly disclose the legal status of any alien in a household. The court discussed the merits of the case in the abstract, at 486 F. Supp. 576,577, as follows:
 The language of the Constitution is not ambiguous. It requires the counting of the "whole number of persons" for apportionment purposes, and while illegal aliens were not a component of the population at the time the Constitution was adopted, they are clearly "persons." By making express provision for Indians and slaves, the Framers demonstrated their awareness that without such provisions, the language chosen would be all-inclusive. According to James Madison, the apportionment was to be "founded on the aggregate number of inhabitants" of each state. The Federalist, No. 54, at 369 (J. Cooke ed. 1961). The Framers must have been aware that this choice of words would include women, children, bound servants, convicts, the insane — and aliens, since the same article of the Constitution grants Congress the power "to establish a uniform rule of naturalization." Art. 1, section 8, cl. 4. We see little on which to base a conclusion that illegal aliens should now be excluded, simply *Page 86 
because persons with their legal status were not an element of our population at the time our Constitution was written.
 The defendants' interpretation of the constitutional language is bolstered by two centuries of consistent interpretation. The Census Bureau has always attempted to count every person residing in a state on census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders . . . . Although the language "the whole number of persons" finally adopted in the fourteenth amendment is identical to the original choice of words in article I, section 2, other options were considered and expressly rejected, after considerable debate, including the options of "voters" or "citizens."
 During the first half of this century, a variety of proposals were made to exclude aliens from the apportionment base, and it appears to have been generally accepted that such a result would require a constitutional amendment.
Based on the foregoing, it is evident that the formulation of the procedures to be used in taking the federal decennial census is a matter exclusively covered by the authority of Congress as implemented by the Bureau of the Census, and that congressional redistricting is based on the federal census report of total population, which includes certain institutional as well as other populations which may be disenfranchised for some reason. Since said total population, as determined according to federal law, is the basis for the allotment of congressional districts to the state, it is also evident that the institutional populations identified as part of that population may not be disregarded for congressional redistricting purposes.
State Legislative Redistricting
Apportionment of the Wisconsin Legislature is principally governed by Wis. Const. art. IV, secs. 2, 3, 4, and 5. The provision most directly relating to your question is Wis. Const. art. IV, sec. 3, which read as follows when originally adopted as part of our constitution in 1848:
 Census and apportionment SECTION 3. The legislature shall provide by law for an enumeration of the inhabitants of the *Page 87 
state in the year one thousand eight hundred and fifty-five, and at the end of every ten years thereafter, and at their first session after such enumeration, and also after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy.
Today, Wis. Const. art. IV, sec. 3, provides:
 Apportionment. SECTION 3. At their first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding soldiers, and officers of the United States army and navy.[2]
Generally speaking, state legislative apportionment need not be based on total population in order to comply with the Equal Protection Clause. As explained in Burns v. Richardson, 384 U.S. 73,91-92 (1966):
 The holding in Reynolds v. Sims, as we characterized it in the other cases decided on the same day, is that "both houses of a bicameral state legislature must be apportioned substantially on a population basis." We start with the proposition that the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured. . . . At several points, we discussed substantial equivalence *Page 88 
in terms of voter population or citizen population, making no distinction between the acceptability of such a test and a test based on total population . . . . Neither in Reynolds v. Sims nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured. The decision to include or exclude any such group involves choices about the nature of representation with which we have been shown no constitutionally founded reason to interfere. Unless a choice is one the Constitution forbids, cf., e. g., Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675, the resulting apportionment base offends no constitutional bar, and compliance with the rule established in Reynolds v. Sims is to be measured thereby.
However, I am satisfied that legislative apportionment "according to the number of inhabitants," under Wis. Const. art. IV, sec. 3, must be based on total state population as shown by the federal decennial census and that legislative districts are to be apportioned on the basis of that population.
Initially, of course, legislative apportionment under Wis. Const. art. IV, sec. 3, took place every five years based on alternating state and federal decennial censuses. Since historically the federal census was based on total resident population and the first census after the adoption of the Wisconsin Constitution was the 7th Census of the United States in 1850, the need for consistency and uniformity in legislative apportionment suggests that the constitutional requirement to enumerate "according to the number of inhabitants" was simply intended to provide for a count of total resident population.
Viewing the term "inhabitant" in the context of legislation contemporaneous with and immediately following the adoption of the Constitution of 1848, I note that the statutory rules of construction set forth in ch. 4, sec. 1, 1849 Revised Statutes, provided that: "The word `inhabitant' shall be construed to mean a resident in the particular locality in reference to which that word is used." Such definition is, of course, consistent with the underlying historical criterion for the *Page 89 
federal decennial census, i.e., residency, and when the Constitution was implemented by the taking of the first state census or enumeration, pursuant to ch. 71, Laws of 1855, it was evident that, with the exception of the exclusion of certain Indians, all "residents" were to be counted, even though they might not then be entitled to exercise the franchise under Wis. Const. art. III, secs. 1 and 2. Chapter 71, secs. 1, 2, 3, and 4, Laws of 1855, thus provided as follows:
 SECTION 1. The town clerks of the several towns in this state, under the direction of the clerk of the board of supervisors of their respective counties, are hereby authorized and required to take an enumeration of the inhabitants in their respective towns, omitting in such enumeration, Indians not entitled to the right of suffrage under the constitution and laws of the state . . . .
 SEC. 2. The secretary of state shall prepare appropriate forms, distinguishing therein persons of each sex, deaf and dumb, blind, insane, and persons of color, and . . . shall forward the requisite number of such forms to the town clerks . . . to enable them to take said census in a uniform manner.
 SEC. 3. The town clerks and assistants shall severally take and subscribe an oath . . . that they will well and truly cause to be made a just and perfect enumeration of all the persons resident within their city, town or division, as the case may be . . . .
 SEC. 4. The said enumeration shall be made by an actual enquiry, by the person taking such census, at every dwelling or by personal enquiry of the head of every family, in their several cities, towns or districts . . . and said enumeration shall include only those whose place of residence shall be in said cities, towns or districts, on the first day of June aforesaid . . . and shall embrace the several families by the name of the head thereof, and the aggregate population therein.
Subsequent decisions of our supreme court have likewise held that, while the constitution commits the Legislature to apportion representatives by districts as nearly equal in population as possible, total population, as determined according to the applicable decennial federal or state census, must be used for such legislative redistricting purposes. The State ex rel.Attorney General v. Cunningham, 81 Wis. 440, 484, 51 N.W. 724
(1892); The State ex rel. Lamb v. Cunningham, *Page 90 Secretary of State, 83 Wis. 90, 53 N.W. 35 (1892). In the latter case, the court further pointed out that since the Legislature is bound by the figures set forth in the census, it cannot disregard that standard so as to apportion based on other computations or considerations, such as the nature and character of the population, saying:
 It seems to be well established that courts will take judicial notice of a census, whether taken under the authority of the state or United States. . . . The apportionment is to be "according to the number of inhabitants," and made at the next session after
the state or United States enumeration; and the enumeration is evidently intended as the basis of apportionment. . . . State ex rel. Att'y Gen. v. Cunningham, 81 Wis. 510. . . .
 Thus it is very obvious, under the rulings of this court in the previous case, that it is not permissible for the defendant here to allege and prove that in making the last apportionment the legislature acted upon the theory that the counties of Chippewa, Florence, Forest, Oneida, Langlade, Price, and Taylor contained 12,777 more inhabitants than appears from the census of 1890, for to do so would open the door on the other side to prove that the other counties of the state, or some of them, contained less inhabitants than appears from the census. Besides, if proved, it would only show that the legislature purposely disregarded the standard of population thus conclusively fixed by the constitution, and based their action upon other computations, estimates, or considerations. The same may, in substance, be said in relation to that part of the proposed answer to the effect that the legislature was induced to make the fourth senate district as they did by reason of the excessive wealth therein, and the nature and character of its population and business interests. But, as we shall in another part of this opinion undertake to show, such considerations cannot justify a disregard of the standards of population fixed in the constitution . . . .
83 Wis. at 140-41.
More recently, in State ex rel. Reynolds v. Zimmerman,22 Wis.2d 544, 126 N.W.2d 551 (1964), the court again emphasized that under our constitution legislative apportionment is based on total state population, saying: *Page 91 
 Sec. 3, art. IV of the constitution, lays down a standard in unambiguous terms for the apportionment of Wisconsin legislative districts. The assembly and senate districts are to be apportioned "according to the number of inhabitants." . . . Thus the constitution itself commits the state to the principle of per capita equality of representation subject only to some geographical limitations in the execution and administration of this principle.
. . . .
 . . . As we have seen, sec. 3, art. IV, Wis. Const., contains a precise standard of apportionment — the legislature shall apportion districts according to the number of inhabitants.
 The "rationality" of apportioning representatives in direct ratio to the population was affirmed when the constitution, embodying the specific standard of sec. 3, art. IV, was ratified.
 Of course, the theoretical norm, or average district population, is obtained by dividing the total state population by number of assembly and senate districts. For the senate districts, the figure predicated upon the 1960 census figures is 119,780, and for assembly districts, 39,528.
22 Wis. 2d at 555-56, 564-65, 567.
It is my opinion, therefore, that Wis. Const. art. IV, sec. 3, requires that total population, as determined according to the federal decennial census, must be used for legislative redistricting purposes and that it would be inappropriate to exclude any institutional population identified as a part of that total population when reapportioning the Legislature.
 Redistricting of County Supervisory and City Aldermanic Districts
In Avery v. Midland County, 390 U.S. 474 (1968), the "one person, one vote" doctrine, developed in federal cases dealing with congressional and state apportionment under the equal protection clause was extended to local governmental units with general powers of government. In Wisconsin, the supreme court had also previously held *Page 92 
that the equal-protection clause of the fourteenth amendment of the federal constitution and Wis. Const. art. I, sec. 1, required apportionment of county supervisory districts on an equal population basis. State ex rel. Sonneborn v. Sylvester,26 Wis.2d 43, 48-49, 59-61, 132 N.W.2d 249 (1965).[3] However, Burnsv. Richardson, 384 U.S. 73 (1966), clearly indicates that thefourteenth amendment does not require that total population from the federal census be the only test which may be used to satisfy this substantial population equivalency standard. That case holds that "voter population or citizen population" may also be an acceptable test.[4] Since "there is no substantial difference between [the equal protection provisions of] the two constitutions," Sonneborn, 26 Wis.2d at 50, I feel the same result would be reached under Wis. Const. art I, sec. 1. Furthermore, despite the fact that Wis. Const. art. IV, secs. 2,3, 4, and 5, provide that apportionment of the state senate and assembly must result in legislative districts bounded by local governmental boundary lines, and be of as equal population as possible according to the last federal decennial census, said provisions relate specifically to state legislative apportionment and do not clearly require that apportionment of local governmental bodies must be on the basis of total population.
In 60 Op. Att'y Gen. 438, 446 (1971), which discussed the reapportionment of county supervisory districts under the then current law, it was stated that: "although some other type of population basis *Page 93 
may be constitutionally permissible, in Wisconsin the total population figures derived from the Federal decennial census has been established as the basis for apportionment. In the absence of demonstrated fraud, etc., then, such data should be utilized without alteration or adjustment." The statutes continue to require that local apportionment be based on the federal census.See secs. 5.15, 59.03 (2)(a), (3)(b), and 62.08 (1), Stats., and there are many compelling practical reasons for continuing to do so. However, it is my opinion that the Legislature could constitutionally permit the use of a population basis such as voter population or citizen population for apportionment of local governmental bodies.
On the other hand, the redistricting of local government using the voter population or citizen population test is entirely different from a redistricting of local government based on a scheme which would rely on total population, but would exclude institutional populations therefrom. The latter test would bear no reasonable relationship to the goal of equal representation for equal numbers of people, since institutional populations normally include persons who are voters or citizens.
As your opinion request points out, some institutionalized populations include residents who are disenfranchised because they are convicted felons, non compos mentis or insane. Wis. Const. art. III, sec. 2. Apparently, it is the local impact of the inclusion of these specific institutional populations in the total population count which provides the impetus for your inquiry.
However, any plan of local apportionment based on the exclusion of just those specific institutional populations from the total population count would probably fare no better on equal protection grounds than a total exclusion of institutional population, for it would likewise fail to treat all persons similarly situated in the same manner. For instance, such a plan would not exclude any noninstitutionalized persons who are nevertheless disenfranchised for one of the reasons listed, nor would it exclude persons who are denied the franchise for other reasons, such as their legal status as minors or aliens. Wis. Const. art. III, secs. 1 and 6; secs. 6.02 and 6.03, Stats. In addition, even the populations of correctional institutions and institutions for *Page 94 
the mentally handicapped or diseased may include persons who are not denied the franchise.
For the reasons stated, it is my opinion that institutional populations cannot be excluded from total population, when total population is used for the purpose of equal population redistricting of county supervisory or city aldermanic districts on the basis of the 1980 census of population. Although such figures may be hard to obtain or extrapolate from the census, the Legislature is not constitutionally barred from choosing voter population or citizen population rather than total population as the standard to insure equal representation for equal numbers of people for local apportionment purposes. Thus, a decision by the Legislature to base local equal population redistricting of county supervisory and city aldermanic districts on the number of citizens entitled to the franchise, is clearly a choice which it may constitutionally make as long as such test is based on thorough documentation and uniformly applied throughout the local governmental unit involved in a systematic, not an ad hoc manner.See Kirkpatrick v. Preisler, 394 U.S. 526, 535 (1969).
BCL:JCM
[1] Initially, "free Persons" and those "bound to Service for a Term of Years" were counted in determining representation, Indians not taxed were not counted, and "three fifths of all other Persons" (slaves) were included in the States' populations. U.S. Const. art. I, sec 2. For current apportionment purposes those several distinct categories of persons are no longer of significance. Even the exclusion of "Indians not taxed" is obsolete since there apparently no longer are any Indians who should be classed as "not taxed." United States Bureau of the Census, Sixteenth Census of the United States: 1940, vol. 1, 7. In Wisconsin, in fact, an identical and equally obsolete exclusion of Indians from the "number of inhabitants" to be counted in determining the population for apportionment purposes was stricken from Wis. Const. art. IV, sec. 3, by vote of the electorate in 1962. Wisconsin Blue Book 771 (1964).
[2] Exclusion of all military persons, without more being shown, would be constitutionally impermissible. Davis v. Mann,377 U.S. 678, 691-92 (1964). However, exclusion of any such persons not meeting a residence standard would be a permissible classification. See Burns v. Richardson, 384 U.S. 73. 92 n. 21 (1966). The 1970 Census "usual place of abode" standard, used by the Bureau of the Census in the case of members of the Armed Forces, has been found to have a rational basis. Borough ofBethel Park, 449 F.2d at 581. Military personnel may freely establish a bona fide residence in Wisconsin for all purposes, including the exercise of the franchise, and this military exclusion apparently has not been generally applied in Wisconsin legislative redistricting. Technically, under the 1980 census, persons in military barracks are counted as residents of "noninstitutional group quarters." United States Bureau of the Census 20th Decennial Census-1980, Questionnaire Reference Book
(D-561), at 90.
[3] Subsequently, in Abate v. Mundt 403 U.S. 182 (1971), a population variation of 11.9 percent between county legislative districts created to correspond with the county's five towns was found constitutionally permissible, in light of the absence of a built-in bias tending to favor any particular area or interest and in light of the legitimate interest of the state in preserving the integrity of political subdivisions.
[4] The use of a "permissible population basis," such as voter population or citizen population, must be distinguished from a "registered voter or actual voter basis." Burns v.Richardson, 384 U.S. at 91-93. Although Burns sustained a state legislative apportionment which the constitution of Hawaii required h based on the number of registered voters, it soundly criticized the use of registered voters as "susceptible to improper influences" and subject to considerable fluctuation, and upheld the apportionment "only because on this record it was found to have produced a distribution of legislators not substantially different from that which would have resulted from the use of a permissible population basis." 384 U.S. at 93. InEllis v. Mayor and City Council of Baltimore, 352 F.2d 123 (4th Cir. 1965) and Calderon v. City of Los Angeles, 93 Cal. Rptr. 361, 4 Cal. 3rd 251, 481 P.2d 489 (1971), both courts invalidated councilmanic districting schemes which utilized a registered voter standard because they produced distributions that significantly diverged from an apportionment based on population.See also Marshall v. Edwards, 582 F.2d 927, 937 (5th Cir. 1978), which found an apportionment plan for a Louisiana parish to be infirm because based on voter registration rather than population.