Thomas J. RIDGE, et al., Plaintiffs,

v.

William C. VERITY, et al., Defendants.

Civ. A. No. 88-351.

United States District Court,
W.D. Pennsylvania.

May 8, 1989.

---

Robert L. Byer, Scott D. Cessar, Robert A. Socci, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for plaintiffs.

Leroy S. Zimmerman, Atty. Gen., Harrisburg, Pa., for Comm. of Pa.

Robert T. Stephen, Atty. Gen., Topeka, Kan., for State of Kan.

Cordia A. Strom, Immigration Reform Law Institute, Washington, D.C., for I.R.L.I.

Don Siegelman, Atty. Gen., Robert M. Weinberg, Asst. Atty. Gen., Montgomery, Ala., for State of Ala.

Jim Mattox, Renea Hicks, Austin, Tex., for State of Tex. (amicus curiae).

Judson H. Miner, Chicago, Ill., Corp. Counsel for City of Chicago (amicus curiae).

Bridget Arimond, Sp. Deputy Corp. Counsel, Thomas P. Hecht, Hopkins & Sutter, Chicago, Ill., for City of Chicago (amicus curiae).

Peter L. Zimroth, Corp Counsel, New York City, for City of New York (amicus curiae).

Robert Abrams, Atty. Gen., State of N.Y., New York City, Barbara M. Wolvovitz, Pittsburgh, Pa., for State of N.Y. (amicus curiae).

Lucas Guttentab, Greg Keller, American Civil Liberties Union, Immigration Task Force, New York City, for American Civil Liberties Union, Immigration Task Force (amicus curiae).

Robert Deasy, Nat. Immigration Project of the Nat. Lawyers Guild, Pittsburgh, Pa., for Nat. Immigration Project of Nat. Lawyers Guild (amicus curiae).

Richard P. Fajardo, Richard Castillo, Mexican American Legal Defense and Educ. Fund, Chicago, Ill., Robert Whitehill, Pittsburgh, Pa., for Marquez-intervenors (amicus curiae).

Sandra M. Schraibman, Asst. Director, Federal Programs Branch Civ. Div., U.S. Dept. of Justice, C. Max Vassanelli, Sr. Trial Counsel, Thomas Peebles, Susan Korytkowski, Trial Attys., Washington, D.C., for U.S. Justice Dept.

Craig McKay, Asst. U.S. Atty., Pittsburgh, Pa., for Verity, U.S. Dept. of Commerce, Bureau of Census & U.S.

Steven R. Ross, Office of the General Counsel, U.S. House of Representatives, David W. DeBruin, John T. Nakahata, John & Block, Washington, D.C., for House of Representatives.

## MEMORANDUM OPINION

STANDISH, District Judge.

### I

This is a civil action in which plaintiffs, the states of Alabama, Kansas and Pennsylvania, various members of the House of Representatives, the Coalition for Constitutional Reapportionment (CCR), and the Federation for American Immigration Reform (FAIR), have filed a complaint challenging the inclusion of illegal aliens [1] in the 1990 census population figures for purposes of congressional apportionment. Plaintiffs seek a declaratory judgment that an apportionment of members of the House of Representatives, among the states, based upon population figures which include illegal aliens, is unconstitutional or otherwise unlawful. Plaintiff's further request injunctive relief enjoining defendants from intentionally including illegal aliens as part of the enumeration upon which such apportionment is made and directing defendants to develop a method of excluding illegal aliens from the census figures used for such apportionment. Defendants, the U.S. Secretary of Commerce, the U.S. Department of Commerce, the Director of the U.S. Bureau of the Census, the U.S. Bureau of the Census, the Clerk of the U.S. House of Representatives and the United States of America, challenge the standing of plaintiffs to maintain this action, and have moved for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the motion will be granted.

### II

In a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 784 (3d Cir.1978); Fed.R.Civ.P.

---

**1.** Plaintiffs define "illegal aliens" as "all persons not lawfully present in the United States". (Plaintiff's answers to defendant's first set of interrogatories No. 1.) While the parties use various terms to describe such persons not lawfully present in the United States, for purposes of uniformity, the court will use the term "illegal aliens" to refer to such persons.

56(c). In the present case, the court concludes that it lacks jurisdiction because the plaintiffs do not possess the requisite standing and, therefore, summary judgment will be entered in favor of defendants and against plaintiffs.

### III

Plaintiffs are 42 members of the House of Representatives, suing in their individual capacities as residents and voters of their states, the states of Pennsylvania, Kansas and Alabama, and two organizations, FAIR and CCR, suing as representatives on behalf of their members who are residents of the 50 states. Defendants are the federal government agencies and officials responsible for conducting the census and apportioning members of the House of Representatives.

Plaintiffs contend that it is unconstitutional or otherwise unlawful to apportion members of the House of Representatives based upon population figures which include illegal aliens. Plaintiffs claim that the inclusion of illegal aliens in census figures for apportionment purposes violates Article I, § 2 and Article II, § 1 of the Constitution. Further, plaintiffs argue that the inclusion of illegal aliens for apportionment purposes will result in states that have large numbers of illegal aliens gaining additional seats, while states with smaller numbers of illegal aliens will not, and therefore, the votes of persons in states with smaller numbers of illegal aliens will be diluted. Plaintiffs do not seek to enjoin the inclusion of illegal aliens in the census figures in general but only to enjoin the inclusion of illegal aliens for purposes of apportionment of members of the House of Representatives. Plaintiffs request this court to direct defendants to develop an appropriate method for excluding illegal aliens from the census figures used to apportion members of the House of Representatives.

Defendants contend that they are constitutionally mandated by Article I, Section 2 of the Constitution, as amended by the Fourteenth Amendment, to count all persons in the 1990 census, including illegal aliens, for purposes of apportionment of the membership of the House of Representatives. Defendants further emphasize that in accordance with Article I, Section 2, of the Constitution, as amended by the Fourteenth Amendment, the federal government and its officers and agencies have, in each decennial census conducted for the past two hundred years, counted all persons residing in the United States, except those persons expressly excluded by the Constitution.

### IV

*Standing*

The threshold question which the court must address is whether it has jurisdiction to decide the merits of this case. Article III of the Constitution limits the jurisdiction of federal courts to the "resolution of 'cases' and 'controversies'". *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge College v. Americans United,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). An aspect of the limitation of Article III is the doctrine of standing. *Page v. Schweiker,* 786 F.2d 150 (3d Cir.1986). Thus, in order to invoke the jurisdiction of this court, plaintiffs must first demonstrate that they have standing to challenge the conduct of defendants. "[T]he standing question is whether [a] plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf". *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975), *citing, Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 695, 7 L.Ed.2d 663 (1962) (emphasis in original) (footnote omitted).

In order for plaintiffs to establish the requisite standing, they must demonstrate "at an irreducible minimum", (1) that they personally have suffered some actual or threatened injury (injury-in-fact); (2) that the injury can be traced to the challenged conduct of defendant (causation) and (3) that the injury is likely to be re-

dressed by a favorable judicial decision (redressability). *Valley Forge, supra,* 454 U.S. at 472, 102 S.Ct. at 758; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Doherty v. Rutgers School of Law,* 651 F.2d 893, 899 (3d Cir.1981).

There are three classes of plaintiffs whose standing is challenged by defendants: (1) the individual plaintiffs, various members of the House of Representatives; (2) the state plaintiffs, Alabama, Kansas and Pennsylvania and (3) the organizational plaintiffs, CCR and FAIR. The court will analyze the standing of each group of plaintiffs with regard to the criteria above. In determining whether each class of plaintiffs has standing, the court must accept as true the allegations in plaintiffs' complaint and must construe it in the light most favorable to plaintiffs. *Warth, supra,* 422 U.S. at 501, 95 S.Ct. at 2206.

## A. *Individual Plaintiffs*

The individual plaintiffs are members of the House of Representatives, suing in their individual capacities as residents and voters of their respective states. Plaintiffs do not allege injury on the basis of their status as members of the House of Representatives.

### 1. Injury–In–Fact

■ To meet the injury-in-fact requirement, a plaintiff must show a "distinct and palpable" injury. *Warth, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. Threatened harm can provide the basis for a finding of injury-in-fact. *Valley Forge, supra.* Where the harm is threatened, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough". *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979), *quoting, Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923) (other citations omitted). "However, [a] plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the

result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not conjectural or hypothetical." *Flaherty v. Torquato,* 623 F.Supp. 55, 57 (W.D.Pa.1985), *aff'd,* 800 F.2d 1133 (1986), *citing, Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

The individual plaintiffs in the present case contend that they satisfy the injury-in-fact requirement because they are able to demonstrate a realistic danger of future injury. They argue that the realistic danger they suffer is the danger that plaintiffs will lose both representation in the House, and presidential electors, if defendants count illegal aliens in the 1990 census for purposes of apportionment.

In 1980, the year of the last decennial census, the United States District Court for the District of Columbia, convened as a three-judge court, addressed the question of standing of plaintiffs similarly challenging the inclusion of illegal aliens in the 1980 census population figures for apportionment purposes. *Federation for American Immigration Reform (FAIR) v. Klutznick,* 486 F.Supp. 564, 570 (D.D.C. 1980), *appeal dismissed,* 447 U.S. 916, 100 S.Ct. 3005, 65 L.Ed.2d 1109 (1980) ("*FAIR*"). In *FAIR,* members of the House of Representatives, and others, filed suit to enjoin the counting of illegal aliens as part of the 1980 census, contending that such conduct would result in an unconstitutional apportionment of the House of Representatives. In addressing the question of standing of the individual plaintiffs, the *FAIR* court stated:

There is no doubt that individuals claiming that their votes are diluted because their Representative represents a greater number of constituents than do other Representatives in the same assembly have standing to challenge the apportionment scheme. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In such a case, the question is "whether the claims of malapportionment ... are in fact made by plaintiffs whose representation would be improved if those claims were to prevail." *Ripon Society*

*v. Nat'l Rep. Party*, 173 U.S.App.D.C. 350, 355, 525 F.2d 567, 572 (1975) (en banc), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). As expressed by the court in *Baker v. Carr*, assuming that the plaintiffs' allegations assert a legally cognizable injury, it is enough for standing purposes that the plaintiffs "are among those who have sustained it." 369 U.S. at 208, 82 S.Ct. at 705.

*FAIR, supra,* 486 F.Supp. at 568–69.

In *FAIR*, the court held that the plaintiffs failed to demonstrate that they had an interest of their own at stake and thus had failed to establish the necessary injury-in-fact. The court reasoned that a finding of standing would require that the injury-in-fact requirement be based on conjecture and speculation. The court found:

> In order to conclude that they have standing, we would have to assume that the Census Bureau will in fact be fairly successful in its efforts to include aliens in the census count, that the mathematical application of the method of equal proportions to the population figures will be affected by the inclusion of these figures, and that Pennsylvania will be among those states which will benefit.

*FAIR, supra,* 486 F.Supp. at 571.

The *FAIR* court considered charts submitted by the plaintiffs "showing their estimation of the effects on congressional apportionment given a variety of different possible assumptions about the illegal alien populations". *Id.* The Court found, however, that the charts showed that certain states would be affected by the inclusion of illegal aliens only based on certain assumptions about the size and distribution of the illegal alien population. The court stated:

> While we may assume, and indeed be convinced that there will be *some* effect on apportionment by the inclusion of illegal aliens in the population base, the plaintiffs have failed to demonstrate with requisite specificity *where* that effect will fall, so that we would be able to find a "concrete injury" *to some particular resident of some particular state.*

*FAIR, supra,* 486 F.Supp. at 572 (emphasis added).

The court found that the plaintiffs could "do no more than speculate as to which states might gain and which might lose representation". *FAIR, supra,* 486 F.Supp. at 570. The plaintiffs were unable to show that his or her vote would be affected, or that plaintiffs, themselves, would be harmed by the conduct of the defendants. The plaintiffs failed to establish that any particular plaintiff had an interest at stake and thus, plaintiffs lacked standing to challenge the proposed conduct of the Census Bureau in the 1980 census.

The interest of the individual plaintiffs in the present case is no less speculative than the interest of the plaintiffs in *FAIR*. Plaintiffs attempt to distinguish *FAIR* on the grounds that, in *FAIR*, the plaintiffs had offered only speculation and conjecture to show where the injury would occur as the result of the inclusion of illegal aliens in the apportionment base. Here, plaintiffs contend that they have cured the problem of speculation that was present in *FAIR* by presenting evidence and establishing facts which demonstrate a realistic danger that they will sustain a direct injury sufficient to meet the requirement of injury-in-fact.

The facts plaintiffs rely on are as follows: (1) studies have shown that the Census Bureau counted approximately 2,056,-000 illegal aliens in the 1980 census; (2) additional studies have demonstrated the geographic distribution of the 2,056,000 illegal aliens counted in the 1980 census; (3) the inclusion of 2,056,000 illegal aliens in the apportionment count derived from the 1980 census resulted in the loss of one representative and one presidential elector for Georgia and Indiana; and (4) using these studies, other census data and accepted demographic methodology, plaintiffs, through their experts, are able to identify the states that are likely to lose representatives and presidential electors as the result of the inclusion of illegal aliens in the apportionment base after the 1990 census. It is plaintiffs' position that they have established the foregoing facts through the findings of plaintiffs' experts, and that these

facts are sufficient to meet the injury-in-fact requirement as to all three groups of plaintiffs.

In support of their position, plaintiffs submit the findings of plaintiffs' expert demographer Jacob S. Siegel. (Siegel Declaration). Mr. Siegel concluded that the exclusion of illegal aliens in the apportionment base following the 1990 census will result in gains and losses of representatives and presidential electors in the following states: California, North Carolina, Minnesota, Wisconsin, Georgia, Kansas, Arizona, Texas, Montana and Michigan. (Siegel Declaration Exs. 5, 6, 9, 10).

Mr. Siegel obtained these results by applying a variety of different assumptions about the population of illegal aliens. He noted that "[t]o deal in part with the uncertainty of population projections, it is prudent and conventional to utilize alternative reasonable assumptions under the same general methodology". (Siegel Declaration at 5). In order to determine which states would be affected in 1990 by the exclusion of illegal aliens, Mr. Siegel estimated (1) the population of each state as of April 1, 1990;[2] (2) the total illegal alien population to be enumerated in the 1990 census[3] and (3) the state distribution of illegal aliens to be enumerated in the 1990 census.[4]

Mr. Siegel made eight apportionment calculations based on populations excluding various numbers of illegal aliens and two apportionment calculations based on populations including illegal aliens. (Siegel Declaration at 10). By employing various projections, assumptions and methodology, Mr. Siegel calculated "a range of plausible possibilities for the apportionment of Congress in 1990, suggesting a high probability of shifts in the apportionments when illegal aliens are excluded, even in modest numbers". (Siegel Declaration 10).[5]

**2.** The April 1, 1990 projected population of each state was calculated by using two alternative assumptions regarding rate of future growth. The annual average rate of growth for each state was computed for two periods, April 1, 1980 to July 1, 1987 and July 1, 1984 to July 1, 1987, by using the 1980 Census Bureau figures and the Census Bureau's estimates of state population for July 1, 1984 and July 1, 1987. These growth rates were then applied to the Census Bureau's population estimates for July 1, 1987. The figures were adjusted *pro rata* in order to be consistent with a preassigned national total for April 1, 1990. (Siegel Declaration at 5–6).

**3.** Mr. Siegel alternatively assumed the illegal alien population in 1990 at 1 million, 2 million, 4 million, and 5.6 million. These alternative assumptions were based on Census Bureau estimates that the 1980 census included approximately 2,057,000 illegal aliens, the 1986 Census Bureau estimate of an illegal alien population of between 3 million and 5 million and the Census Bureau estimates of an annual influx of 200,000 illegal aliens per year. Mr. Siegel included a high assumption of 5.6 million and a low assumption of 1 million. The assumption of a population of 1 million takes into account the elimination of over 2 million illegal aliens as the result of the Amnesty Program and the possibility that many illegal aliens avoid being counted. (Siegel Declaration at 6–7).

**4.** The state distribution was estimated by using two alternative assumptions. The first assumption was achieved by distributing the alternative estimates of illegal aliens in proportion to the state distribution of legalization applications un-der the Immigration Reform and Control Act of 1986 (IRCA). The second assumption was taken from a study by two Census Bureau employees, Jeffrey S. Passel and Karen A. Woodrow, which represents state estimates of illegal aliens counted in the 1980 census. (Siegel Declaration at 7–8).

**5.** The first 1990 apportionment calculation was made using populations based on 1980–1987 growth rates. The results were as follows: Under an estimation of 1 million illegal aliens along with either of two assumptions as to their state distribution, California would lose one congressional seat and North Carolina would gain one seat. Under an estimation of 2 million illegal aliens and either of two assumptions as to state distribution, California would lose two congressional seats and North Carolina and Minnesota would each gain one seat. Under an estimation of 4 million illegal aliens and either of two assumptions as to state distribution, California would lose three seats and North Carolina, Minnesota and Wisconsin would each gain one seat. Under an estimation of 5.6 million illegal aliens, and two different assumptions as to state distribution, two different results are reached. Using the "Passel–Woodrow" distribution method, California would lose four seats and North Carolina, Georgia, Minnesota and Wisconsin would each gain one seat. Using the "legalization-application" distribution method, California would lose four seats, Texas would lose one seat and North Carolina, Georgia, Kansas, Minnesota and Wisconsin would each gain one seat. The second 1990 apportionment calculation was made using pop-

Plaintiffs also submit the declaration of Professor Leon L. Bouvier, another of plaintiffs' expert demographers, who reviewed the declaration of Jacob S. Siegel and concurred completely with the conclusions of Mr. Siegel. (Bouvier Declaration).

Plaintiffs further rely on a 1984 report and a "1990 apportionment chart" prepared by David C. Huckabee, a congressional research service analyst. Plaintiffs contend that, based upon various assumptions identified in the report and chart prepared by Mr. Huckabee, if the Census Bureau includes in the 1990 census count the same number of illegal aliens as it counted in the 1980 census count[6], and if that number of illegal aliens is included in the apportionment base, Pennsylvania, West Virginia and Kansas will lose one representative and one presidential elector. Further, Alabama will lose one representative and one presidential elector if 4.12 million illegal aliens are counted in the 1990 census figures. Further, if the Census Bureau includes illegal aliens in the 1990 census count, California and Texas will each gain one representative and one presidential elector. (Plaintiffs' Answers to Defendants' First Set of Interrogatories No. 4; No. 9).

Plaintiffs also contend that, based upon various assumptions identified in the report and chart prepared by Mr. Huckabee, if the Census Bureau includes in the 1990 census count as "few as 2,000,000" illegal aliens, and that number of illegal aliens is included in the apportionment base, Texas and California will each gain one representative, and New York, Illinois and Florida will each potentially gain one representative. (Plaintiffs' answers to defendants' first set of interrogatories No. 7). Plaintiffs allege that Mr. Huckabee's studies show that by

including illegal aliens in the census figures used for apportionment purposes, the citizens of those states with a large population of illegal aliens, namely Texas and California, will have a greater proportional representation in the House of Representatives than the citizens of all other states. (Plaintiffs' answers to defendants' first set of interrogatories No. 8).

The evidence submitted by plaintiffs, if accepted as true, fails to show where the alleged injury will fall. Under the calculations of plaintiffs' experts, the injury will fall upon various different plaintiffs, depending on which set of variables are used.

The declaration of Mr. Siegel merely "presents a range of results for the apportionment in 1990". (Siegel Declaration at 5). These results were obtained by using calculations based upon various projections and assumptions regarding rates of population growth, illegal alien population and state distribution, the elimination of illegal aliens as the result of the Amnesty Program, and the possibility that some illegal aliens avoid being counted. Mr. Siegel noted that "[i]ndeed, as the data on these variables are changed to reflect various assumptions, the projected apportionment may vary." (Siegel Declaration at 5). As Mr. Siegel acknowledged,

[o]f course, there is uncertainty in population projections, including the contribution of the error in the postcensal estimates for 1987.... We try to reduce the uncertainty by developing alternative series by the same method with *different assumptions,* each viewed as realistic possibilities, and noting whether the essential action to be taken is the same under them. We have taken this step and, while the results differ under the two basic sets of projections, the fact

---

ulations based on 1984–1987 growth rates. The results, under either of two assumptions as to their state distribution, were as follows: Under an estimation of 1 million illegal aliens, no states change. Under an estimation of 2 million illegal aliens, California would lose one congressional seat and Georgia would gain one seat. Under an estimation of 4 million illegal aliens and the "Passel–Woodrow" distribution method, California would lose three seats and Georgia, Wisconsin and Arizona would each gain one

seat. Under the "legalization-applications method", California would lose three seats and Georgia, Wisconsin and Michigan would each gain one seat. (Siegel Declaration Exs. 1 through 10).

**6.** Plaintiffs contend that the Census Bureau counted at least 2,056,000 illegal aliens in the 1980 census and, at a minimum, will count at least 2,056,000 illegal aliens in the 1980 census. (Plaintiffs' answers to defendants' first set of interrogatories No. 6).

that the exclusion of illegal aliens is highly likely to modify the apportionment is confirmed ... If there are differences in the states affected according to the various methods and assumptions, they may be explained by the fact that the date of reference of the projections presented in this declaration is April 1, 1990, not July 1, 1990 ... The fact that the figures obtained for illegal aliens for states in 1990 are estimates subject to error is readily acknowledged.

(Siegel Declaration at 15–16) (emphasis in original).

As Mr. Siegel's declaration confirms, while the exclusion of illegal aliens will likely modify apportionment, different states are affected in differing degrees depending on what methods and assumptions are applied. This uncertainty with respect to where the injury will fall is fatal to plaintiffs' case.

Mr. Huckabee similarly noted the speculative nature of his conclusions. With reference to his report, Mr. Huckabee stated that "there are numerous limitations ... that should be considered in using these data for apportionments ..." (Huckabee Report at 2), and, regarding the estimates of the undocumented aliens counted in the 1980 census, "[a]lthough these estimates may realistically report the distribution of the undocumented alien population, using estimates such as these for apportionment is not without risk". (Huckabee Report at 5–6). Referring to the Census Bureau projections, Mr. Huckabee pointed out, "[p]rojections of this type have been inaccurate in the past. If we adjust these numbers to reflect the number of undocumented aliens counted in the 1980 census, the numbers become even more speculative." (Huckabee Report at 9). As to the calculations he made based on two methods,[7] Mr. Huckabee noted, "[n]either of these methods should be regarded as estimates of the impact of including the undocumented aliens in the population figures that will be

used for the 1990 census. There are too many unknowns to even characterize these figures as rough estimates. These figures should be used for illustrative purposes only". (Huckabee Report at 10).

The individual plaintiffs cannot show where the alleged injury will fall as they are unable to establish how many illegal aliens will be present in the United States in 1990, in which states these illegal aliens will reside, or to what extent the illegal population will come forward to be counted in the 1990 census.

In addition, since the taking of the 1980 census, the Immigration Reform and Control Act of 1986 (IRCA) became effective. Raymond B. Penn, Assistant Commissioner, Legalization, Immigration and Naturalization Service (INS) states in his declaration that IRCA amended the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*, and significantly revised United States immigration policy. (Penn Declaration 1). IRCA imposes civil and criminal penalties and sanctions on all employers and other individuals who employ, hire, refer, recruit or continue to employ undocumented aliens who are not authorized to work in the United States. 8 U.S.C. § 1324a(a)(1) and (2). In addition, IRCA prohibits employers from hiring any individual without verifying that the applicant is presenting his or her true identity and that the applicant is eligible to work in the United States. 8 U.S.C. § 1324a(b)(1). Each individual must attest, under penalty of perjury, that he or she is a United States citizen or national, a lawful permanent resident alien, or an alien authorized for employment in the United States. 8 U.S.C. § 1324a(b)(2). Further, IRCA provides that certain illegal aliens are eligible to apply to the Immigration and Naturalization Service (INS) for amnesty and legal resident status. Illegal aliens present in the United States since January 1, 1982 who meet certain requirements are eligible for legal resident status. 8 U.S.C. § 1255a. Special agricultural workers who

---

**7.** The first method assumes that the same number of aliens that were estimated to have been counted in the 1980 census will be estimated to have been counted in the 1990 census. The second method assumes that the number of

aliens counted in the 1990 census will change from the number of aliens estimated to have been counted in the 1980 census at a rate proportional to the change in each state's total population. (Huckabee Report at 10).

meet certain requirements may be granted temporary resident status and then permanent resident status after one year if agricultural services were performed in 1984, 1985 and 1986. 8 U.S.C. § 1160.

IRCA further complicates the problem of speculation since the passage of IRCA has likely had an effect on the number of illegal aliens present in the United States, the number of illegal aliens immigrating to the United States, the number of illegal aliens now holding legal resident status in the United States and the number of illegal aliens willing to come forward to be counted as illegal aliens.

The individual plaintiffs argue that a number of courts have allowed plaintiffs to challenge Census Bureau procedures without requiring them to prove future injury to a precise certainty in order to establish standing necessary to challenge Census Bureau procedures. They allege that the present case is parallel to those census cases. *Carey v. Klutznick*, 637 F.2d 834 (2d Cir.1980), *rev'd on other grounds*, 653 F.2d 732 (2d Cir.1981), *cert. denied sub nom.*, *Carey v. Baldrige*, 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *City of Willacoochee v. Baldrige*, 556 F.Supp. 551 (S.D.Ga.1983); *City of Philadelphia v. Klutznick*, 503 F.Supp. 663 (E.D.Pa.1980); *City of Camden v. Plotkin*, 466 F.Supp. 44 (D.N.J.1978). These cases, however, are distinguishable from the present case. While the plaintiffs in these cases were not required to prove future injury to a precise certainty, they were required to establish that their rights were those affected by the actions of the defendants.

In *Carey v. Klutznick, supra,* the city and state of New York, the governor of New York, the mayor of New York City and various voters and taxpayers challenged the manner in which the Census Bureau conducted the 1980 census in the state of New York claiming that the census had resulted in an undercount and a subsequent loss of federal funds. The United States Court of Appeals for the Second Circuit found that, unlike the plaintiffs in *FAIR*, who failed to allege that his or her particular state would be affected, the

plaintiffs there alleged "concrete harm in the form of dilution of *their* votes and decreased federal funds flowing to *their* city and state, thus establishing *their* standing". *Carey v. Klutznick, supra,* 637 F.2d at 838. (emphasis added).

In *City of Willacoochee, Ga. v. Baldrige., supra,* the city and its mayor filed an action challenging the accuracy of the population count of the city. The plaintiffs claimed that the inaccurate population count would deprive them of their share of the proceeds of two federally funded programs which distributed funds on the basis of population data. The district court found that the city had satisfied the requirement of injury-in-fact and established the necessary standing since the loss of federal funds due to an inaccurate population count "would be a distinct and palpable injury" *to the city. Id.* 556 F.Supp. at 554.

In *City of Camden v. Plotkin, supra,* the plaintiffs, the City of Camden and three individuals challenged the 1970 federal census results alleging that there had been an undercounting of the general population and minority groups which would result in loss of funding for *their city.* The court found that the allegation of loss of funding to the plaintiffs' city established the requisite injury-in-fact.

In *City of Philadelphia v. Klutznick, supra,* plaintiffs, the City of Philadelphia and various individuals, alleged that the failure of the Census Bureau to conduct a proper census count and its failure to properly conduct local review would dilute plaintiffs' votes and cause a loss of revenue-sharing funds. The court distinguished *FAIR*, noting that in *FAIR* the plaintiffs could only speculate about the size and distribution of the alien population and further, that the statistics were not yet, and might never be, available. Conversely, in *City of Philadelphia*, the action was brought after the census so that the facts that would establish improper conduct already existed. The court held that the city and the individual plaintiffs had the necessary standing to properly maintain the action since the votes of the indi-

vidual plaintiffs would be diluted and the loss of revenue aid would be suffered by *their city.*

In each of the cases cited by plaintiffs, the rights asserted were not speculative. In each case, the plaintiffs produced evidence that *they* were directly affected by the action of defendants as the conduct affected *their* city or state or *their* vote or *their* funds. Here, plaintiffs have failed to produce evidence that the conduct of defendants will affect their particular rights.

Individual plaintiffs additionally argue that the standing test employed in *FAIR* is highly restrictive and contrary to the weight of authority and to the holdings of the Supreme Court in *Baker, supra,* and *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988), and the United States Court of Appeals for the Third Circuit in *Colonial Penn Insurance Co. v. Heckler,* 721 F.2d 431 (3d Cir.1983). It is plaintiffs' position that the holdings in these cases do not require proof to a precise certainty of future injury in order to meet the injury-in-fact requirement of standing.

The court agrees that under the holdings in these cases, plaintiffs are not required to prove future injury or threatened harm to a precise certainty; however, plaintiffs are required to show that they are among those who will sustain the threatened harm. *FAIR, supra.*

As in *FAIR,* none of the plaintiffs in this case can show which states would gain and which would lose representation in Congress, and thus plaintiffs are unable to allege that the weight of his or her vote would *be affected* by the inclusion of illegal aliens in the census figures for purposes of apportionment of congressional seats. As stated by the United States Supreme Court:

> Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.

*Warth, supra,* 422 U.S. at 502, 95 S.Ct. at 2207.

Based on the evidence offered, it is sheer speculation as to the identities of the states that will be affected by the inclusion of illegal aliens in the census count for purposes of apportionment. It may or may not be that the state in which a particular plaintiff resides is a state which will ultimately lose representation. No plaintiff can produce evidence to show that he, personally, rather than some other individual resident and voter of some other state, is threatened with injury. The speculative nature of these factors precludes plaintiffs from establishing the necessary injury-in-fact requirement of standing.

2. Causation

■ The second standing element requires plaintiffs to show that their alleged injuries can be traced to the challenged conduct of defendants. *Allen, supra,* 468 U.S. at 751, 104 S.Ct. at 3324; *Valley Forge, supra,* 454 U.S. at 472, 102 S.Ct. at 758, *citing, Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). In other words, plaintiffs are required to demonstrate that the injury "fairly can be traced to the challenged action". *Simon, supra,* 426 U.S. at 41, 96 S.Ct. at 1925.

In the present case, plaintiffs must show that plaintiffs' alleged injury, the loss of representatives and presidential electors, can be traced to defendants' failure to exclude illegal aliens from the census figures used for apportionment.

Plaintiffs allege that the causal connection is established by the assertion of plaintiffs' experts that there is a realistic danger that as the result of including illegal aliens in the census count for apportionment purposes, plaintiffs will lose representation in the House of Representatives and will lose presidential electors. Plaintiffs contend that this is confirmed by the fact that counting illegal aliens in the 1980 census resulted in the loss of one representative for both Georgia and Indiana.

Accepting as true, the assertion of plaintiffs' experts that significantly more illegal aliens reside in some states than in other states, the inclusion of illegal aliens in the census figures used for apportionment will

have some effect on apportionment of members of the House of Representatives. Plaintiffs, however, cannot point to an identifiable group who will be affected by the inclusion of illegal aliens. A finding of causation does not establish standing, since plaintiffs have failed to establish injury-in-fact. *FAIR, supra.*

### 3. Redressability

■ To satisfy the third element necessary to establish standing, a plaintiff must show "that the exercise of the Court's remedial powers would redress the claimed injuries". *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). This element examines the causal connection between the alleged injury and the relief requested. *Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

Plaintiffs, in the present case, seek to enjoin defendants from including illegal aliens as part of the census figures used to apportion members of the House of Representatives, and request that the court enter an order directing defendants to devise a remedy that will exclude illegal aliens from the census figures used for apportionment. However, plaintiffs have failed to show that a judicial ruling in their favor will redress their alleged injuries.

The United States District Court for the District of Columbia addressed the issue of redressability in *FAIR.* In *FAIR,* plaintiffs similarly sought an order directing that the Census Bureau develop a method for identification and exclusion of illegal aliens from the census figures used for apportionment. The *FAIR* plaintiffs proposed that the Census Bureau estimate the total number of illegal aliens based on a citizenship question in the census questionnaire coupled with INS data on the number of legal aliens.

In *FAIR,* the court held that the plaintiffs had failed to demonstrate that the relief they sought would redress their alleged injuries. The court found "that the

defendants [had] made a convincing showing that neither the Census Bureau nor INS figures [were] accurate enough to permit such a calculation with any reasonable degree of accuracy". *FAIR, supra,* 486 F.Supp. at 573. The court reasoned:

> While the Bureau has devoted large amounts of research and resources to improving its performance, at this point its potential success is entirely speculative. It may well be, in spite of the Bureau's best efforts, that minority groups in general will continue to be undercounted to the point that inclusion of illegal aliens in the apportionment base is more a matter of theory than practice. In that event, this court will have decided a constitutional issue, ordered the expenditure of millions of dollars and caused substantial delay in the taking of the census, all with absolutely no effect on the plaintiffs' voting rights. Our jurisdiction may not rest on so ephemeral a possibility of relief.

486 F.Supp. at 573–574.

In the present case, plaintiffs' experts opine that there is a feasible method for excluding illegal aliens from the census figures used for apportionment. The declarations of plaintiffs' experts Jacob S. Siegel and Leon L. Bouvier do not, standing alone, show redressability because they fail to set forth the material facts on which their opinions are based. The method they contend is appropriate is a method factually described by defendants' experts. Plaintiffs aver that the residual method set forth by defendants' expert, Dr. Jeffrey Passel, Assistant Division Chief for Population Estimates and Projections, Population Division, Bureau of the Census, is "entirely feasible" for excluding illegal aliens from the census figures used for apportionment.[8] (Siegel Declaration at 13–14; Bouvier Declaration at 4). Accordingly, since plaintiffs rely upon the evidence submitted by defendants to prove the element of redressability, defendants' evidence must be reviewed to determine whether such evi-

---

**8.** Plaintiffs concede that the other methods described by Dr. Passel raise concerns regarding prejudice to the success of quality and timeli-

ness of the census as well as public reaction and the need for pretests. (Siegal Declaration at 13–14; Bouvier Declaration at 4).

dence viewed from plaintiffs' perspective provides, factually, support for plaintiffs' claim of redressability.

The residual method set forth by Dr. Passel would require a modification of the census questionnaire to include a question on citizenship. In addition, this method would require that the INS conduct a special alien registration in late 1989 or early 1990. The number of legal aliens determined by the INS alien registration would then be subtracted from the number of residents in order to enumerate the number of illegal aliens. (Siegel Declaration at 13–14; Bouvier Declaration at 4; Passel Declaration at 8).

Dr. Passel, regarding all of the methods described by him, opined that "none of [the] methods can produce sufficiently accurate census counts for congressional apportionment." (Passel Declaration at 7–8). Specifically, with regard to the residual method, the method upon which plaintiffs rely, Dr. Passel concluded that such a method would be inappropriate for use in identifying illegal aliens so as to exclude them from the census figures used for apportionment. (Passel Declaration at 9).

Dr. Passel explained that the residual method would require the application of various assumptions in order to produce residual estimates for large geographic areas, such as the United States. However, because no information is available on smaller geographic areas, such as states, a proportion estimated at the national level must be assumed to apply to the states (synthetic assumption). Dr. Passel noted that "since the congressional apportionment process can be sensitive to quite small differences in the numbers, the errors introduced by use of synthetic assumptions, which are known to occur frequently, could make a difference in the distribution of one or more congressional seats". (Passel Declaration at 9).

Dr. Passel's opinions and conclusions are based on the Census Bureau's application of the residual method to obtain estimates of illegal aliens following the 1980 census. That application demonstrated various problems including both errors in the citizenship data [9] and inaccuracies with the INS data on alien registration [10]. In addition, since that time, the INS has discontinued its Alien Registration Program, following the 1981 registration and thus the INS does not have records of legal aliens alive and living in the United States or their addresses. Dr. Passel indicated that these records would be essential to an application of the residual method. Dr. Passel noted that the application of the residual method after the 1980 census "illustrates some of the problems presented by this method and its inappropriateness for use in excluding [illegal aliens] from apportionment counts ... These estimates have proven useful for various research applications, but they are not sufficiently accurate for apportionment purposes." (Passel Declaration at 9).

While Dr. Passel did note that the lack of INS data on legal aliens does not totally rule out the application of the residual method at the national level, he did, however, conclude that the estimates of legal aliens developed at the national level cannot be disaggregated to the state level. (Passel Declaration at 14). More critically,

9. An analysis of the census data on citizenship and country of birth showed that the data suffered from three major sources of error: (a) failure to report country of birth; (b) misreporting of citizenship status and (c) misreporting of nativity. These errors were deemed significant for use of the residual method. Correction to these errors were required prior to using the data in application of the residual method. Dr. Passel concluded that the deficiencies of this data was of "sufficiently poor quality that they are unsuitable for providing accurate data for excluding undocumented aliens from counts used for congressional apportionment". (Passel Declaration at 11).

10. The INS data used in the residual method also required corrections. The data used was collected by the INS in the January, 1980 Alien Registration Program. Various assumptions were then applied to make adjustments to the data. Dr. Passel noted, "[t]he failure of synthetic assumptions, while not necessarily critical for research and analysis, could create estimation errors in many areas significant enough to affect congressional apportionment". (Passel Declaration at 13).

Dr. Passel determined that, in any event, use of the residual method could not provide the necessary estimates within the required time frame. He stated:

> ... use of this method could not provide estimates by December 31, 1990, *even* if all the necessary data were available. It took several years of very careful research and analysis to produce the estimates regarding the 1980 census. The national estimates were first produced and presented in 1983; the state estimates in 1984. The same type of thorough analysis would be required following the 1990 census.

(Passel Declaration at 14. Emphasis in original).

Susan M. Miskura, Chief of the Decennial Planning Division of the Bureau of the Census, concurred with Dr. Passel regarding the residual method. Ms. Miskura stated that such an approach would create operational problems. Citizenship questions would result in untruthful answers or the avoidance of enumeration which, in turn, would result in inaccuracies in the count of the total resident population, to the detriment of other programs which are based on census figures. Moreover, the only potential source of data on legal residents would be registration data collected by the INS. She likewise opined that even if the INS registration program were reinstituted, the data would not be collected by the Census Bureau while conducting the 1990 census. (Miskura Declaration at 10–11).

Plaintiffs have failed to show that the remedy they seek will redress their alleged injuries. Plaintiffs seek an order from this court directing defendants to take all necessary action to avoid including illegal aliens as part of the enumeration used to apportion members of the House of Representatives. Plaintiffs contend that the residual method set forth by defendants' expert, Dr. Passel, could be successfully implemented by the Census Bureau in order to determine the number of illegal aliens counted in the 1990 census so as to exclude them for apportionment purposes, but plaintiffs have failed to show that residual method can be successfully implemented by the Census Bureau to accomplish such a result.

As in *FAIR*, the potential success of the Census Bureau in identifying illegal aliens for purposes of excluding them from the figures used for apportionment is speculative. Jurisdiction of the court may not rest on speculation. *FAIR, supra,* 486 F.Supp. at 574; *Simpson v. Heckler,* 630 F.Supp. 736, 740 (E.D.Pa.1986).

The individual plaintiffs have failed to establish the elements of injury-in-fact and redressability, and, therefore, the individual plaintiffs lack standing.

**B.** *State Plaintiffs*

■ The plaintiff states, Pennsylvania, Kansas and Alabama bring this action in their capacity as *states qua states,* not as *parens patriae,* and allege that by defendants' failure to exclude illegal aliens from the census figures used for purposes of apportionment, they will suffer reduced political power and prestige in the nation's legislature. The plaintiff states contend that they possess the necessary standing since the inclusion of illegal aliens in the apportionment base will cause them to lose representation in the House of Representatives and in the Electoral College.

While a city or state may suffer an injury as a recipient of federal funds, *City of Philadelphia, supra; Carey, supra,* a city or state may not suffer an injury by the loss of representation, "for the loss of representation can only be suffered by the representatives' flesh-and-blood constituency". *City of Philadelphia, supra,* 503 F.Supp. at 671.

Here, plaintiff states do not allege injury on the basis of loss of funding, but, rather, on the loss of representation, reduced political power and prestige. The loss of representation in the House of Representatives cannot be suffered by a state, but only by the residents of the state. The loss of representation in the electoral college also cannot be suffered by a state, but only by electors or voters of a particular state. The plaintiff states, therefore, have failed to assert an injury as states.

Moreover, even assuming *arguendo*, that the plaintiff states were able to establish an alleged injury suffered by them as states, they fail to satisfy the necessary elements of injury-in-fact and redressability for the same reasons the court has found that the individual plaintiffs fail to satisfy those elements, and, therefore, the state plaintiffs fail to establish standing.

C. *Plaintiff Organizations*

 Two organizations, FAIR and CCR are plaintiffs suing as representatives on behalf of their members who are residents of each of the 50 states. (Declarations of Daniel A. Stein and Barnaby W. Zall). FAIR is a non-profit corporation which was chartered in 1979 to advocate an end to illegal immigration, to conform laws and policies governing immigration and to enforce laws prohibiting illegal immigration. (Stein Declaration). CCR is an unincorporated association organized to advocate on behalf of its members and inform the public of the need to prevent the unconstitutional apportionment of members of the House of Representatives.

An organization or association may have standing on behalf of its members if it can demonstrate that its members satisfy the requisite elements of standing. As the Supreme Court has stated:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members. *E.g., National Motor Freight Assn. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy". *See Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

*Warth supra,* 422 U.S. at 511, 95 S.Ct. at 2211. Therefore, FAIR and CCR must demonstrate that its members are able to establish the injury-in-fact, causation and redressability requirements of standing. *Warth, supra; McKinney v. U.S. Dept. of Treasury,* 799 F.2d 1544, 1550 (Fed.Cir. 1986) (citations omitted).

For the same reasons set forth in the court's discussion of standing with regard to the individual plaintiffs, the court finds that FAIR and CCR have failed to establish the elements of injury-in-fact and redressability and therefore these plaintiffs have no standing.

V.

*Conclusion*

Plaintiffs, individual members of the House of Representatives, the states of Alabama, Kansas and Pennsylvania and CCR and FAIR have failed to meet the injury-in-fact and redressability elements necessary to establish standing. Absent a showing by plaintiffs that they have suffered an injury to themselves that is likely to be redressed by a favorable decision, "... exercise of its power by a federal court would be gratuitous and thus inconsistent with the Article III limitation". *Simon, supra,* 426 U.S. at 38, 96 S.Ct. at 1924. Plaintiffs lack standing to challenge the proposed conduct of defendants in the 1990 census, and, therefore, the court lacks jurisdiction to decide the merits of this case. Accordingly, defendants' motion for summary judgment shall be granted.

An order follows.

ORDER

AND NOW, this 8th day of May, 1989, in accordance with the foregoing memorandum, it is ORDERED as follows:

1. Plaintiffs are Thomas J. Ridge, Joseph M. Gaydos, Richard T. Schultze, John P. Murtha, Douglas Walgren, William Goodling, Paul E. Kanjorski, George W. Gekas, William F. Clinger, Curt Weldon, Donald Ritter, Bud Shuster, Lawrence Coughlin, Austin J. Murphy, Joseph Kolter, Robert A. Borski, Robert S. Walker, Joseph M. McDade, Gus Yatron, Thomas M. Foglietta, citizens and residents of the Commonwealth of Pennsylvania and members of the United States House of Representatives, in their individual capacities; The Commonwealth of Pennsylvania; James Slattery, Jan Meyers, Robert Whittaker, Daniel Glickman, Pat Roberts, citizens and

residents of the State of Kansas and members of the United States House of Representatives, in their individual capacity; The State of Kansas; Harley O. Staggers, Robert Wise, citizens and residents of the State of West Virginia and members of the United States House of Representatives, in their individual capacities; Barbara B. Kennelly, citizen and resident of the State of Connecticut and member of the United States House of Representatives, in her individual capacity; Harris W. Fawell, Henry J. Hyde, citizens and residents of the State of Illinois and members of the United States House of Representatives, in their individual capacities; Dan Burton, citizen and resident of the States of Indiana and member of the United States House of Representatives, in his individual capacity; William S. Broomfield, citizen and resident of the State of Michigan and member of the United States House of Representatives, in his individual capacity; William Emerson, citizen and resident of the State of Missouri and member of the United States House of Representatives, in his individual capacity; Stephen L. Neal, Cass Ballenger, Tim Vallentine, citizens and residents of the State of North Carolina and members of the United States House of Representatives, in their individual capacities; Dennis Smith, citizen and resident of the State of Oregon and member of the United States House of Representatives, in his individual cpacity; Thomas J. Bliley, Jr., citizen and resident of the State of Virginia and member of the United States House of Representatives, in his individual capacity; Thomas E. Petri, citizen and resident of the State of Wisconsin and member of the United States House of Representatives, in his individual capacity; Thomas Bevill, citizen and resident of the State of Alabama and member of the United States House of Representatives, in his individual capacity; the State of Alabama; Helen Delich Bentley, citizen and resident of the State of Maryland and member of the United States House of Representatives, in her individual capacity; William E. Dannermeyer, citizen and resident of the State of California and member of the United States House of Representatives, in his individual capacity;

The Coalition for Constitutional Reapportionment, an unincorporated association, by Sandeep Khanna, Scott Strayer and Margaret G. Hubbard, Members; and Federation for American Immigration Reform (FAIR), a non profit corporation.

2. Defendants are William Verity, in his official capacity as Secretary, United States Department of Commerce; United States Department of Commerce; John G. Keane, in his official capacity as Director, Bureau of the Census; Bureau of the Census; Donald K. Anderson, in his official capacity as Clerk of the United States House of Representatives and The United States of America.

3. The motion of defendants for summary judgment against plaintiffs is granted.

4. Summary judgment is hereby entered in favor of defendants and against plaintiffs.